OPINION OF THE COURT
 

 Wesley, J.
 

 In January 1995 plaintiffs — relatives of people killed by handguns — sued 49 handgun manufacturers in Federal court alleging negligent marketing, design defect, ultra-hazardous activity and fraud. A number of defendants jointly moved for summary judgment. The United States District Court for the Eastern District of New York (Weinstein, J.), dismissed the product liability and fraud causes of action, but retained plaintiffs’ negligent marketing claim
 
 (see, Hamilton v Accu-Tek,
 
 935 F Supp 1307, 1315). Other parties intervened, including plaintiff Stephen Fox, who was shot by a friend and permanently disabled. The gun was never found; the shooter had no recollection of how he obtained it. Other evidence, however, indicated that he had purchased the gun out of the trunk of a car from a seller who said it came from the “south.” Eventually, seven plaintiffs went to trial against 25 of the manufacturers.
 

 Plaintiffs asserted that defendants distributed their products negligently so as to create and bolster an illegal, underground market in handguns, one that furnished weapons to minors and criminals involved in the shootings that precipitated this
 
 *230
 
 lawsuit. Because only one of the guns was recovered, plaintiffs were permitted over defense objections to proceed on a market share theory of liability against all the manufacturers, asserting that they were severally liable for failing to implement safe marketing and distribution procedures, and that this failure sent a high volume of guns into the underground market.
 

 After a four-week trial, the jury returned a special verdict finding 15 of the 25 defendants failed to use reasonable care in the distribution of their guns. Of those 15, nine were found to have proximately caused the deaths of the decedents of two plaintiffs, but no damages were awarded. The jury awarded damages against three defendants — American Arms, Beretta U.S.A. and Taurus International Manufacturing — upon a finding that they proximately caused the injuries suffered by Fox and his mother (in the amounts of $3.95 million and $50,000, respectively). Liability was apportioned among each of the three defendants according to their share of the national handgun market: for American Arms, 0.23% ($9,000); for Beretta, 6.03% ($241,000); and for Taurus, 6.80% ($272,000).
 

 Defendants unsuccessfully moved for judgment as a matter of law pursuant to Federal Rules of Civil Procedure rule 50 (b). The District Court articulated several theories for imposing a duty on defendants “to take reasonable steps available at the point of * * * sale to primary distributors to reduce the possibility that these instruments will fall into the hands of those likely to misuse them”
 
 (Hamilton v Accu-Tek,
 
 62 F Supp 2d 802, 825). The court noted that defendants, as with all manufacturers, had the unique ability to detect and guard against any foreseeable risks associated with their products, and that ability created a special “protective relationship” between the manufacturers and potential victims of gun violence
 
 (id.,
 
 at 821). It further pointed out that the relationship of handgun manufacturers with their downstream distributors and retailers gave them the authority and ability to control the latter’s conduct for the protection of prospective crime victims. Relying on
 
 Hymowitz v Eli Lilly & Co.
 
 (73 NY2d 487,
 
 cert denied
 
 493 US 944), the District Court held that apportionment of liability among defendants on a market share basis was appropriate and that plaintiffs need not connect Fox’s shooting to the negligence of a particular manufacturer.
 

 On appeal, the Second Circuit certified the following questions to us:
 

 “(1) Whether the defendants owed plaintiffs a duty
 
 *231
 
 to exercise reasonable care in the marketing and distribution of the handguns they manufacture?
 

 “(2) Whether liability in this case may be apportioned on a market share basis, and if so, how?” (see,
 
 Hamilton v Beretta U.S.A. Corp.,
 
 222 F3d 36, 39).
 

 We accepted certification (95 NY2d 878) and now answer both questions in the negative.
 

 Parties’ Arguments
 

 Plaintiffs argue that defendant-manufacturers have a duty to exercise reasonable care in the marketing and distribution of their guns based upon four factors: (1) defendants’ ability to exercise control over the marketing and distribution of their guns, (2) defendants’ general knowledge that large numbers of their guns enter the illegal market and are used in crime, (3) New York’s policy of strict regulation of firearms and (4) the uniquely lethal nature of defendants’ products.
 

 According to plaintiffs, handguns move into the underground market in New York through several well-known and documented means including straw purchases (a friend, relative or accomplice acts as purchaser of the weapon for another), sales at gun shows, misuse of Federal firearms licenses and sales by non-stocking dealers (i.e., those operating informal businesses without a retail storefront). Plaintiffs further assert that gun manufacturers have oversaturated markets in states with weak gun control laws (primarily in the Southeast), knowing those “excess guns” will make their way into the hands of criminals in states with stricter laws such as New York, thus “profiting” from indiscriminate sales in weak gun states. Plaintiffs contend that defendants control their distributors’ conduct with respect to pricing, advertising and display, yet refuse to institute practices such as requiring distribution contracts that limit sales to stocking gun dealers, training salespeople in safe sales practices (including how to recognize straw purchasers), establishing electronic monitoring of their products, limiting the number of distributors, limiting multiple purchases and franchising their retail outlets.
 

 Defendants counter that they do not owe a duty to members of the public to protect them from the criminal acquisition and misuse of their handguns. Defendants assert that such a duty— potentially exposing them to limitless liability — should not be imposed on them for acts and omissions of numerous and
 
 *232
 
 remote third parties over which they have no control. Further, they contend that, in light of the comprehensive statutory and regulatory scheme governing the distribution and sale of firearms, any fundamental changes in the industry should be left to the appropriate legislative and regulatory bodies.
 

 The Duty Equation
 

 The threshold question in any negligence action is: does defendant owe a legally recognized duty of care to plaintiff? Courts traditionally “fix the duty point by balancing factors, including the reasonable expectations of parties and society generally, the proliferation of claims, the likelihood of unlimited or insurer-like liability, disproportionate risk and reparation allocation, and public policies affecting the expansion or limitation of new channels of liability”
 
 (Palka v Servicemaster Mgt. Servs. Corp.,
 
 83 NY2d 579, 586;
 
 see also, Strauss v Belle Realty Co.,
 
 65 NY2d 399, 402-403). Thus, in determining whether a duty exists, “courts must be mindful of the precedential, and consequential, future effects of their rulings, and ‘limit the legal consequences of wrongs to a controllable degree’ ”
 
 (Lauer v City of New York,
 
 95 NY2d 95, 100 [quoting
 
 Tobin v Grossman,
 
 24 NY2d 609, 619]).
 

 Foreseeability, alone, does not define duty — it merely determines the scope of the duty once it is determined to exist
 
 (see, Pulka v Edelman,
 
 40 NY2d 781, 785,
 
 rearg denied
 
 41 NY2d 901;
 
 see also, Eiseman v State of New York,
 
 70 NY2d 175, 187). The injured party must show that a defendant owed not merely a general duty to society but a specific duty to him or her, for “[wlithout a duty running directly to the injured person there can be no liability in damages, however careless the conduct or foreseeable the harm”
 
 (Lauer, supra,
 
 at 100). That is required in order to avoid subjecting an actor “to limitless liability to an indeterminate class of persons conceivably injured by any negligence in that act”
 
 (Eiseman, supra,
 
 at 188). Moreover, any extension of the scope of duty must be tailored to reflect accurately the extent that its social benefits outweigh its costs
 
 (see, Waters v New York City Hous. Auth.,
 
 69 NY2d 225, 230).
 

 The District Court imposed a duty on gun manufacturers “to take reasonable steps available at the point of * * * sale to primary distributors to reduce the possibility that these instruments will fall into the hands of those likely to misuse them”
 
 (Hamilton v Accu-Tek, supra,
 
 62 F Supp 2d, at 825). We have been cautious, however, in extending liability to defendants for
 
 *233
 
 their failure to control the conduct of others. “A defendant generally has no duty to control the conduct of third persons so as to prevent them from harming others, even where as a practical matter defendant can exercise such control”
 
 (D’Amico v
 
 Christie, 71 NY2d 76, 88;
 
 see also, Purdy v Public Adm’r of County of Westchester,
 
 72 NY2d 1, 8,
 
 rearg denied
 
 72 NY2d 953). This judicial resistance to the expansion of duty grows out of practical concerns both about potentially limitless liability and about the unfairness of imposing liability for the acts of another.
 

 A duty may arise, however, where there is a relationship either between defendant and a third-person tortfeasor that encompasses defendant’s actual control of the third person’s actions, or between defendant and plaintiff that requires defendant to protect plaintiff from the conduct of others. Examples of these relationships include master and servant, parent and child, and common carriers and their passengers.
 

 The key in each is that the defendant’s relationship with either the tortfeasor or the plaintiff places the defendant in the best position to protect against the risk of harm. In addition, the specter of limitless liability is not present because the class of potential plaintiffs to whom the duty is owed is circumscribed by the relationship. We have, for instance, recognized that landowners have a duty to protect tenants, patrons or invitees from foreseeable harm caused by the criminal conduct of others while they are on the premises
 
 (see, e.g., Nallan v Helmsley-Spear, Inc.,
 
 50 NY2d 507, 518-519). However, this duty does not extend beyond that limited class of plaintiffs to members of the community at large
 
 (see, Waters v New York City Hous. Auth., supra,
 
 69 NY2d, at 228-231). In
 
 Waters,
 
 for example, we held that the owner of a housing project who failed to keep the building’s door locks in good repair did not owe a duty to a passerby to protect her from being dragged off the street into the building and assaulted. The Court concluded that imposing such a duty on landowners would do little to minimize crime, and the social benefits to be gained did “not warrant the extension of the landowner’s duty to maintain secure premises to the millions of individuals who use the sidewalks of New York City each day and are thereby exposed to the dangers of street crime”
 
 {id.,
 
 at 230).
 

 A similar rationale is relevant here. The pool of possible plaintiffs is very large — potentially, any of the thousands of
 
 *234
 
 victims of gun violence.
 
 [1]
 
 Further, the connection between defendants, the criminal wrongdoers and plaintiffs is remote, running through several links in a chain consisting of at least the manufacturer, the federally licensed distributor or wholesaler, and the first retailer. The chain most often includes numerous subsequent legal purchasers or even a thief.
 
 [2]
 
 Such broad liability, potentially encompassing all gunshot crime victims, should not be imposed without a more tangible showing that defendants were a direct link in the causal chain that resulted in plaintiffs’ injuries, and that defendants were realistically in a position to prevent the wrongs. Giving plaintiffs’ evidence the benefit of every favorable inference, they have not shown that the gun used to harm plaintiff Fox came from a source amenable to the exercise of any duty of care that plaintiffs would impose upon defendant manufacturers.
 

 Plaintiffs make two alternative arguments in support of a duty determination here. The first arises from a manufacturer’s “special ability to detect and guard against the risks associated with [its] products [and] warrants placing all manufacturers, including these defendants, in a
 
 protective relationship with those foreseeably and potentially put in harm’s way by their products” (Hamilton v Accu-Tek, supra,
 
 62 F Supp 2d, at 821 [emphasis added]). Plaintiffs predicate the existence of this protective duty — particularly when lethal or hazardous products are involved — on foreseeability of harm and our products liability cases such as
 
 MacPherson v Buick Motor Co.
 
 (217 NY 382).
 

 
 *235
 
 As we noted earlier, a duty and the corresponding liability it imposes do
 
 not
 
 rise from mere foreseeability of the harm (see,
 
 Pulka, supra,
 
 40 NY2d, at 786). Moreover, none of plaintiffs’ proof demonstrated that a change in marketing techniques would likely have prevented their injuries. Indeed, plaintiffs did not present any evidence tending to show to what degree their risk of injury was enhanced by the presence of negligently marketed and distributed guns, as opposed to the risk presented by all guns in society (see
 
 generally,
 
 Twerski & Sebok,
 
 Liability Without
 
 Cause?
 
 Further Ruminations on Cause-in-Fact as Applied to Handgun Liability,
 
 32 Conn L Rev 1379).
 

 The cases involving the distribution or handling of hazardous materials, relied upon by plaintiffs, do not support the imposition of a duty of care in marketing handguns. The manufacturer’s duty in each case was based either on a products liability theory — that is, the product was defective because of the failure to include a safety feature — or on a failure to warn
 
 (see, e.g., Hunnings v Texaco, Inc.,
 
 29 F3d 1480 [11th Cir 1994] [defectively packaged hazardous substance accompanied by lack of adequate warnings];
 
 Blueflame Gas v Van Hoose,
 
 679 P2d 579 [Colo 1984] [insufficiently odorized propane gas];
 
 Flint Explosive Co. v Edwards,
 
 84 Ga App 376, 66 SE2d 368 [1951] [defective dynamite]). Certainly too, a manufacturer may be held liable for complicity in dangerous or illegal activity
 
 (see, e.g., Suchomajcz v Hummel Chem. Co.,
 
 524 F2d 19 [3d Cir 1975] [manufacturer sold chemicals to retailer with knowledge that retailer intended to use them in making and selling illegal firecracker assembly kits]). Here, defendants’ products are concededly not defective — if anything, the problem is that they work too well. Nor have plaintiffs asserted a defective warnings claim or presented sufficient evidence to demonstrate that defendants could have taken reasonable steps that would have prevented their injuries. Likewise, this case can hardly be analogized to those in which a duty has been imposed upon owners or possessors of hazardous substances to safeguard against unsupervised access by children
 
 (see, Kush v City of Buffalo,
 
 59 NY2d 26, 31;
 
 Kingsland v Erie County Agric. Socy.,
 
 298 NY 409, 426).
 

 Plaintiffs also assert that a general duty of care arises out of the gun manufacturers’ ability to reduce the risk of illegal gun trafficking through control of the marketing and distribution of their products. The District Court accepted this proposition and posited a series of structural changes in defendants’
 
 *236
 
 marketing and distribution regimes that might “reduce the risk of criminal misuse by ensuring that the first sale was by a responsible merchant to a responsible buyer”
 
 (Hamilton v Accu-Tek, supra,
 
 62 F Supp 2d, at 820). Those changes, and others proposed by plaintiffs that a jury might reasonably find subsumed in a gun manufacturer’s duty of care,
 
 [3]
 
 would have the unavoidable effect of eliminating a significant number of lawful sales to “responsible” buyers by “responsible” Federal firearms licensees (FFLs) who would be cut out of the distribution chain under the suggested “reforms.” Plaintiffs, however, presented no evidence, either through the testimony of experts or the submission of authoritative reports, showing any statistically significant relationship between
 
 particular classes
 
 of dealers and crime guns.
 
 [4]
 
 To impose a general duty of care upon the makers of firearms under these circumstances because of their purported ability to control marketing and distribution of their products would conflict with the principle that any judicial recognition of a duty of care must be based upon an assessment of its efficacy in promoting a social benefit as against its costs and burdens
 
 (see, Waters v New York City Hous. Auth.,
 
 69 NY2d 225,
 
 supra).
 
 Here, imposing such a general duty of care would create not only an indeterminate class of plaintiffs but also an indeterminate class of defendants whose liability might have little relationship to the benefits of controlling illegal guns
 
 (see, Waters, supra,
 
 69 NY2d, at 230).
 

 Finally, plaintiffs and the District Court identify an alternative basis for imposing a duty of care here under the negligent entrustment doctrine, arising out of the firearms manufacturers’ authority over “downstream distributors and retailers” to whom their products are delivered
 
 (see, Hamilton v Accu-Tek, supra,
 
 62 F Supp 2d, at 821). The owner or possessor of a dangerous instrument is under a duty to entrust it to a responsible person whose use does not create an unreasonable risk of harm to others
 
 (see, Rios v Smith,
 
 95 NY2d 647;
 
 *237
 

 Splawnik v Di Caprio,
 
 146 AD2d 333, 335; Restatement [Second] of Torts § 390). The duty may extend through successive, reasonably anticipated entrustees
 
 (see, Rios v Smith, supra).
 
 There are, however, fatal impediments to imposing a general duty of care here under a negligent entrustment theory.
 

 The tort of negligent entrustment is based on the degree of knowledge the supplier of a chattel has or should have concerning the entrustee’s propensity to use the chattel in an improper or dangerous fashion. Gun sales have subjected suppliers to liability under this theory
 
 (see, Splawnik, supra; see also, Cullum & Boren-McCain Mall v Peacock,
 
 267 Ark 479, 592 SW2d 442 [1980];
 
 Semeniuk v Chentis,
 
 1 Ill App 2d 508, 117 NE2d 883 [1954]). Of course, without the requisite knowledge, the tort of negligent entrustment does not lie
 
 (see, Earsing v Nelson,
 
 212 AD2d 66 [dismissing a negligent entrustment claim against the manufacturer of a BB gun because a dealer’s knowledge of the individual’s ability to use the gun safely could not be imputed to the manufacturer]).
 

 The negligent entrustment doctrine might well support the extension of a duty to manufacturers to avoid selling to certain distributors in circumstances where the manufacturer knows or has reason to know those distributors are engaging in substantial sales of guns into the gun-trafficking market on a consistent basis.
 
 [5]
 

 [6]
 
 Here, however, plaintiffs did not present such evidence. Instead, they claimed that manufacturers should not engage in certain broad categories of sales. Once again, plaintiffs’ duty calculation comes up short. General statements about an industry are not the stuff by which a common-law court fixes the duty point. Without a showing that specific
 
 *238
 
 groups of dealers play a disproportionate role in supplying the illegal gun market, the sweep of plaintiffs’ duty theory is far wider than the danger it seeks to avert.
 
 [6]
 

 At trial, plaintiffs’ experts did surmise that since manufacturers receive crime gun trace requests conducted by the Bureau of Alcohol, Tobacco and Firearms, they could analyze those requests to locate retailers who disproportionately served as crime gun sources, and cut off distributors who do business with them. In essence, plaintiffs argue that defendants had an affirmative duty to investigate and identify corrupt dealers. This is neither feasible nor appropriate for the manufacturers.
 

 Plaintiffs’ experts explained that a crime gun trace is the means by which the BATF reconstructs the distribution history of a gun used in a crime or recovered by the police.
 
 [7]
 
 While manufacturers may be generally aware of traces for which they are contacted, they are not told the purpose of the trace, nor
 
 *239
 
 are they informed of the results.
 
 [8]
 
 The BATF does not disclose any subsequently acquired retailer or purchaser information to the manufacturer. Moreover, manufacturers are not in a position to acquire such information on their own. Indeed, plaintiffs’ law enforcement experts agreed that manufacturers should not make any attempt to investigate illegal gun trafficking on their own since such attempts could disrupt pending criminal investigations and endanger the lives of undercover officers.
 

 Federal law already has implemented a statutory and regulatory scheme to ensure seller “responsibility” through licensing requirements and buyer “responsibility” through background checks.
 
 [9]
 
 While common-law principles can supplement a
 
 *240
 
 manufacturer’s statutory duties, we should be cautious in imposing novel theories of tort liability while the difficult problem of illegal gun sales in the United States remains the focus of a national policy debate (see, Lytton,
 
 Tort Claims Against Gun Manufacturers, supra,
 
 65 Mo L Rev, at' 52-54 [analyzing courts’ capacities and limitations in analyzing complex statistical data]).
 

 Opinion per Wesley, J.
 

 In sum, analysis of this State’s longstanding precedents demonstrates that defendants — given the evidence presented here — did not owe plaintiffs the duty they claim; we therefore answer the first certified question in the negative.
 

 Market Share Liability
 

 The Second Circuit has asked us also to determine if our market share liability jurisprudence is applicable to this case. Having concluded that these defendant-manufacturers did not owe the claimed duty to these plaintiffs, we arguably need not reach the market share issue. However, because of its particularly significant role in this case, it seems prudent to answer the second question.
 

 Market share liability provides an exception to the general rule that in common-law negligence actions, a plaintiff must prove that the defendant’s conduct was a cause-in-fact of the injury. This Court first examined and adopted the market share theory of liability in
 
 Hymowitz v Eli Lilly & Co.
 
 (73 NY2d 487,
 
 supra).
 
 In
 
 Hymowitz,
 
 we held that plaintiffs injured by the drug DES were not required to prove which defendant manufactured the drug that injured them but instead, every manufacturer would be held responsible for every plaintiffs injury based on its share of the DES market. Market share liability was necessary in
 
 Hymowitz
 
 because DES was a fungible product and identification of the actual manufacturer that caused the injury to a particular plaintiff was impossible. The Court carefully noted that the DES situation was unique. Key to our decision were the facts that (1) the manufacturers acted in a parallel manner to produce an identical, genetically marketed product; (2) the manifestations of injury were far removed from the time of ingestion of the product; and (3) the Legislature made a clear policy decision to revive these time-barred DES claims
 
 (see, id.,
 
 at 508).
 

 Circumstances here are markedly different. Unlike DES, guns are not identical, fungible products. Significantly, it is often possible to identify the caliber and manufacturer of the
 
 *241
 
 handgun that caused injury to a particular plaintiff.
 
 [10]
 
 Even more importantly — given the negligent marketing theory on which plaintiffs tried this case — plaintiffs have never asserted that the manufacturers’ marketing techniques were uniform. Each manufacturer engaged in different marketing activities that allegedly contributed to the illegal handgun market in different ways and to different extents. Plaintiffs made no attempt to establish the relative fault of each manufacturer, but instead sought to hold them all liable based simply on market share.
 
 [11]
 

 In
 
 Hymowitz,
 
 each manufacturer engaged in tortious conduct parallel to that of all other manufacturers, creating the same risk to the public at large by manufacturing the same defective product. Market share was an accurate reflection of the risk they posed. Here, the distribution and sale of every gun is not equally negligent, nor does it involve a defective product. Defendants engaged in widely-varied conduct creating varied risks. Thus, a manufacturer’s share of the national handgun market does not necessarily correspond to the amount of risk created by its alleged tortious conduct. No case has applied the market share theory of liability to such varied conduct and wisely so.
 

 We recognize the difficulty in proving precisely which manufacturer caused any particular plaintiff’s injuries since crime guns are often not recovered. Inability to locate evidence, however, does not alone justify the extraordinary step of applying market share liability
 
 (see, Healey v Firestone Tire & Rubber Co.,
 
 87 NY2d 596, 601 [loss of an allegedly defective multipiece truck tire rim which caused the plaintiffs injuries did not
 
 *242
 
 obviate the requirement that the plaintiff identify its exact manufacturer];
 
 see also, Matter of New York State Silicone Breast Implant Litig.,
 
 166 Misc 2d 85, 90 [refusal to apply market share liability to silicone breast implants; “(t)he reality of a plaintiff’s plight when product identification cannot be made is like any other plaintiff who claims injury from a product that has been lost or destroyed”],
 
 affd for reasons stated
 
 234 AD2d 28). Rather, a more compelling policy reason — as was shown in the DES casés — is required for the imposition of market share liability.
 

 Notably, courts in New York and other jurisdictions have refused to extend the market share theory where products were not fungible and differing degrees of risk were created
 
 (see, e.g., Brenner v American Cyanamid Co.,
 
 263 AD2d 165 [lead pigment used in paint];
 
 Matter of New York State Silicone Breast Implant Litig., supra
 
 [silicone breast implants];
 
 DaSilva v American Tobacco Co.,
 
 175 Misc 2d 424 [cigarettes];
 
 see also, Sanderson v International Flavors & Fragrances,
 
 950 F Supp 981 [CD Cal 1996] [perfumes containing different aldehydes];
 
 Doe v Cutter Biological,
 
 852 F Supp 909 [D Idaho 1994] [blood clotting agent];
 
 210 E. 86th St. Corp. v Combustion Eng’g,
 
 821 F Supp 125 [SD NY 1993] [asbestos];
 
 Skipworth v Lead Indus. Assn.,
 
 547 Pa 224, 690 A2d 169 [1997] [lead paint pigments]). Similarly, plaintiffs here have not shown a set of compelling circumstances akin to those in
 
 Hymowitz
 
 justifying a departure from traditional common-law principles of causation.
 

 This case challenges us to rethink traditional notions of duty, liability and causation. Tort law is ever changing; it is a reflection of the complexity and vitality of daily life. Although plaintiffs have presented us with a novel theory — negligent marketing of a potentially lethal yet legal product, based upon the acts not of one manufacturer, but of an industry — we are unconvinced that, on the record before us, the duty plaintiffs wish to impose is either reasonable or circumscribed. Nor does the market share theory of liability accurately measure defendants’ conduct. Whether, in a different case, a duty may arise remains a question for the future.
 

 Accordingly, both certified questions should be answered in the negative.
 

 Chief Judge Kaye and Judges Smith, Levine, Ciparick, Rosenblatt and Graffeo concur.
 

 Following certification of questions by the United States Court of Appeals for the Second Circuit and acceptance of the
 
 *243
 
 questions by this Court pursuant to section 500.17 of the Rules of the Court of Appeals (22 NYCRR 500.17), and after hearing argument by counsel for the parties and consideration of the briefs and the record submitted, certified questions answered in the negative.
 

 [1]
 

 . According to the U.S. Census Bureau’s Statistical Abstract for the U.S., there were 7,402 murders by handguns in 1998 (see, U.S. Census Bureau, Statistical Abstract of the United States: 2000, Table No. 333). This figure does not separately identify legal/illegal handgun deaths. In 1997, there were 39,400 gunshot wounds treated in hospital emergency rooms. For 59% of the victims of nonfatal gunshot wounds, the type of firearm was unknown. Where the firearm was known, 82% were shot by handguns, but additional details about the firearm used are not given (see, Firearms and Crime Statistics, U.S. Department of Justice, Bureau of Justice Statistics <http://www.courts.state.ny.us/reporter/webdocs/guns.htm>; see
 
 also,
 
 Zawitz and Strom,
 
 Firearm Injury and Death From Crime, 1993-1997,
 
 Bureau of Justice Statistics: Selected Findings, at 4 [Oct. 2000] <http:// www.courts.state.ny.us/reporter/webdocs/fidc9397.pdf>).
 

 [2]
 

 . .One of the original plaintiffs was Katina Johnstone. Her husband was killed with a Smith & Wesson revolver. The gun was recovered and traced to its lawful owner, who had reported it missing after a burglary of his home two weeks before the shooting. Johnstone’s case was transferred to Federal court in California
 
 (Hamilton v Accu-Tek,
 
 47 F Supp 2d 330).
 

 [3]
 

 . For example, limiting the volume of sales in states with weak gun controls to insure against circulation of the oversupply to strong gun control states such as New York; restricting distribution entirely to established retail stores carrying stocks of guns; franchising of retail outlets; and barring distribution to dealers who sell at unregulated gun shows
 
 (see, Hamilton v Accu-Tek,
 
 62 F Supp 2d 802, at 826, 829-832).
 

 [4]
 

 .
 
 See,
 
 Lytton,
 
 Tort Claims Against Gun Manufacturers For Crime-Related Injuries: Defining a Suitable Role for the Tort System in Regulating the Firearms Industry,
 
 65 Mo L Rev 1, 41.
 

 [5]
 

 . An analysis of Bureau of Alcohol, Tobacco and Firearms (BATF) data for 1998 reveals that a very small number of FFLs do account for a significant portion of guns used in crimes. “Just 1.2 percent of dealers — 1,020 of the approximately 83,200 licensed retail dealers and pawnbrokers — accounted for over 57 percent of the crime guns traced to current dealers in 1998”
 
 (see,
 
 Commerce in Firearms in the United States, BATF Document, at 2 [Feb. 2000] <http://www.courts.state.ny.us/reporter/webdocs/020400report.pdf>). However, the data does not reveal whether any given FFL’s high incidence of crime gun sales is attributable to irresponsible conduct, or merely reflects a high volume of legal sales or some other activity (such as theft) over which the FFL has no control. BATF has “targeted” those dealers to “determine the reasons for diversion of firearms from this relatively small proportion of dealers”
 
 (id.).
 
 Because of BATF’s continued pursuit in identifying how handguns enter the illegal market, it may well be that a core group of corrupt FFLs will emerge at some future time. This might alter the duty equation.
 

 [6]
 

 . Our decision is in accord with most jurisdictions that have considered this issue
 
 (see, e.g., Armijo v Ex Cam,
 
 843 F2d 406 [10th Cir 1998],
 
 affg
 
 656 F Supp 771;
 
 First Commercial Trust Co. v Colt’s Mfg. Co.,
 
 77 F3d 1081 [8th Cir 1996];
 
 Shipman v Jennings Firearms,
 
 791 F2d 1532 [11th Cir 1986];
 
 City of Philadelphia v Beretta U.S.A., Corp.,
 
 126 F Supp 2d 882 [ED Pa 2000];
 
 Adkinson v Rossi Arms Co.,
 
 659 P2d 1236 [Alaska 1983];
 
 First Commercial Trust Co. v Lorcin Eng’g,
 
 321 Ark 210, 900 SW2d 202 [1995];
 
 Delahanty v Hinckley,
 
 564 A2d 758 [DC Ct App 1989];
 
 Trespalacios v Valor Corp.,
 
 486 So 2d 649 [Fla Dist Ct App 1986];
 
 Riordan v International Armament Corp.,
 
 132 Ill App 3d 642, 477 NE2d 1293 [1985];
 
 Linton v Smith & Wesson,
 
 127 Ill App 3d 676, 469 NE2d 339 [1984];
 
 Resteiner v Sturm, Ruger & Co.,
 
 223 Mich App 374, 566 NW2d 53 [1997];
 
 King v R.G. Indus.,
 
 182 Mich App 343, 451 NW2d 874 [1990];
 
 City of Cincinnati v Beretta U.S.A. Corp.,
 
 2000 WL 1133078 [Ohio Ct App 2000];
 
 Knott v Liberty Jewelry & Loan,
 
 50 Wash App 267, 748 P2d 661 [1988];
 
 cf., City of Boston v Smith & Wesson Corp.,
 
 2000 WL 1473568, 2000 Mass Super LEXIS 352 [Mass Sup Ct 2000]). There are two notable exceptions, both of which involved different factual contexts and different theories of negligent marketing not relevant here
 
 (see, Halberstam v S. W. Daniel, Inc.,
 
 No. 95-C3323 [ED NY 1998];
 
 Merrill v Navegar, Inc.,
 
 75 Cal App 4th 500, 89 Cal Rptr 2d 146 [1999],
 
 superseded by grant of review
 
 991 P2d 755).
 

 [7]
 

 . Tracing involves the process of tracking a recovered crime gun’s history from its source through the chain of distribution to its first retail purchaser. If the BATF is unable to trace the gun from its own records, it contacts the manufacturer and asks for the identity of the federally licensed distributor to whom the gun was sold. The BATF then follows up with the named distributor and the subsequently named retailer to determine the identity of the first purchaser
 
 (see,
 
 Commerce in Firearms in the United States, BATF Document, at 19-20 [Feb. 2000] <http:www.courts.state.ny.us/ reporter/webdocs/020400report.pdf>;
 
 Crime Gun Trace Analysis Reports: The Illegal Youth Firearms Market in 27 Communities,
 
 1998 Youth Crime Gun Interdiction Initiative, BATF Document, at 5 [Feb. 1999] <http:// www.courts.state.ny.us/reporter/webdocs/termused.pdf>).
 

 [8]
 

 . In fact, the “ATF emphasizes that the appearance of [an FFL] or a first unlicensed purchaser of record in association with a crime gun or in association with multiple crime guns in no way suggests that either the FFL or the first purchaser has committed criminal acts. Rather, such information may provide a starting point for further and more detailed investigation” (Youth Crime Gun Interdiction Initiative,
 
 supra,
 
 at 17 chttp:// www.courts.state.ny.us/reporter/webdocs/updatel.pdf>).
 

 [9]
 

 . Gun manufacturers must be licensed by the Federal government in order to produce, deal and ship firearms in interstate commerce
 
 (see,
 
 18 USC § 922 [a] [1] [A]; § 923 [a]; 27 CFR 178.41 [a]). Manufacturers may sell only to licensed importers, licensed dealers, or licensed collectors
 
 (see,
 
 18 USC § 922 [a] [2]). Manufacturers must keep records of each firearm they make and sell, including the firearm’s type, model, caliber, serial number, as well as information about the purchaser
 
 (see,
 
 18 USC § 923 [g] [1] [A]; 27 CFR 178.123 [a], [b]). Any firearm shipped must bear a unique and permanent serial number and the manufacturer’s identity
 
 (see, 18
 
 USC § 922 [k]; § 923 [i]; 27 CFR 178.34, 178.92 [a] [1].).
 

 Like manufacturers, firearms dealers must also be licensed by the Federal government
 
 (see,
 
 18 USC § 922 [a] [1] [A]; § 923 [a]; 27 CFR 178.41 [a]). As the “principal agent of federal enforcement”
 
 (Huddleston v United States,
 
 415 US 814, 824-825), licensed dealers must initiate criminal background checks on purchasers and may sell only to those who have been cleared by the FBI or other appropriate law enforcement agencies
 
 (see,
 
 18 USC § 922 [c], [s] [1]; [t] [1]). Licensed dealers may not sell firearms to individuals who fall within certain at-risk categories (felons, drug users, individuals previously committed to mental institutions and individuals subject to domestic restraining orders, or convicted of crimes of domestic violence, among others)
 
 (see, id.,
 
 § 922 [d]). Federal law also establishes age limits for gun purchasers and sales cannot be made to juveniles
 
 (see, id.,
 
 § 922 [b] [1]; [x] [1]).
 

 Licensees must keep records of all multiple sales to unlicensed persons
 
 (see,
 
 18 USC § 923 [g] [3] [A]). Additionally, all licensees must report any theft or loss of a firearm to appropriate authorities within 48 hours
 
 (see, id.,
 
 § 923 [g] [6]). The BATF oversees compliance with Federal requirements and is charged with enforcing this entire regulatory scheme
 
 (see generally,
 
 27 CFR parts 178 and 179). Dealers face criminal penalties and license revocation for intentional unlawful sales
 
 (see,
 
 18 USC §§ 924, 923 [e]; 27 CFR 178.73 [a]).
 

 [10]
 

 . We note that New York has recently become the second State in the nation to establish a new “fingerprinting” system for identifying guns by the distinctive marks on their shell casings
 
 (see,
 
 General Business Law § 396-ff).
 

 [11]
 

 . Plaintiffs do not contend that negligent marketing of handguns is the sole source of handguns used in crime. They acknowledge that some injuries from handguns will still occur. Indeed, the District Court, using BATF data, assessed the enhanced risk at 33% leaving a significant probability that plaintiffs’ injuries from unidentified weapons came from guns that had not been negligently marketed
 
 (see, Hamilton v Accu-Tek, supra,
 
 62 F Supp 2d, at 826 [noting that only one third of all guns used in juvenile crimes come directly from FFLs]). Nonetheless, the District Court assessed damages as if the risk enhancement were 100% (see,
 
 id.,
 
 at 845). It would seem that even if plaintiffs had established a duty here in conjunction with market share liability, they would be limited to damages calculated on the proportion to which defendants enhanced the risk (see, Twerski & Sebok,
 
 Liability Without Cause? Further Ruminations on Cause-in-Fact as Applied to Handgun Liability, supra,
 
 32 Conn L Rev, at 1398-1404).