■ ELISHA KOBRE et al., Respondents, v UNITED JEWISH APPEAL-FEDERATION OF JEWISH PHILANTHROPIES OF NEW YORK, INC., Also Known as UJA-FEDERATION OF JEWISH PHILANTHROPIES OF NEW YORK, INC., Formerly Known as THE FEDERATION OF JEWISH PHILANTHROPIES OF NEW YORK and Others, et al., Appellants. [819 NYS2d 737]—

Order, Supreme Court, New York County (Alice Schlesinger, J.), entered October 31, 2002, which, to the extent appealed from, denied the motions of defendants United Jewish Appeal (UJA) and Federation of Jewish Philanthropies of New York Service Corporation (FOJP) for summary judgment, unanimously reversed, on the law, without costs, the motions granted and the complaint dismissed. The Clerk is directed to enter judgment accordingly. Appeal from order, same court and Justice, entered October 31, 2002, which modified a prior decision dated July 30, 2002, by striking that portion of the decision which stated that defendant UJA owed a duty of care to the injured plaintiff and replaced it with language stating that there

was an issue of fact on this issue, and denied its motion for summary judgment, unanimously dismissed as academic, without costs, in light of the foregoing.

Camp Mogen Avraham (the Camp), is a summer camp for boys in Sullivan County, New York. Plaintiff Elisha Kobre started attending the Camp when he was about six years old and became a "counselor in training" in 1990. In the summer of 1991, he was 15 years old. As he was too old to return as a camper, but too young to qualify as a full-time counselor, he was offered a position as a junior counselor. This was under the supervision of his uncle, Moshe Stavsky, the Camp's head lifeguard.

The Camp is on a lake and is equipped with wooden docks. On August 4, 1991, Elisha completed his first lifeguard class on "shallow dives," which are used to rescue distressed swimmers. The class was taught by Stavsky on one of the lakeside docks. This dock was marked to indicate a water depth of six feet. During the class, Elisha and each of the other class participants made successful practice dives. When the class ended, Elisha took an additional practice dive and struck the bottom of the lake. He suffered injuries which rendered him a quadriplegic.

Because Elisha was a minor, the action was commenced on his behalf by his mother, Sheryl Kobre. She also asserted a derivative claim for loss of services. In the complaint, plaintiffs alleged a number of acts and omissions which they claimed constituted actionable negligence by the Camp, UJA and FOJP. These included permitting individuals under the defendants' control to dive off of a dock, a sign which inaccurately stated that the depth of the water in the area was six feet,[1] and failing to post signs warning against diving into shallow water.

The action against the Camp was discontinued in June 1999, upon a finding, affirmed by the Third Department, that Elisha was a Camp employee at the time of his accident. As a result, Elisha was relegated to recovery of workers' compensation benefits from that defendant (*Matter of Kobre v Camp Mogen Avraham*, 255 AD2d 636 [1998]; *Matter of Kobre v Camp Mogen Avraham*, 293 AD2d 893 [2002]).

In 1999, UJA and FOJP moved for summary judgment. In a July 6, 2000 order, the IAS court denied the motion, finding "triable issues of fact as to the control that defendant UJA had over the operation of the camp and the relationship between

---

1. A Department of Health report prepared after the accident stated that due to a drought, the actual water depth where the ill-fated dive took place was less than six feet.

FOJP Services Corp., the UJA and the [C]amp." This order was not appealed.

Defendants UJA and FOJP then moved to amend their answer to raise the affirmative defense of workers' compensation. This motion was also denied, and defendants appealed. This Court affirmed the denial because the claims against the defendants alleged direct, not vicarious liability (288 AD2d 158, 158-159 [2001]). The Court also stated that plaintiffs were suing defendants upon a theory that, through the Camp's dependence on funding and advice from defendants, they exercised actual control over the Camp's operations so as to render them directly liable for plaintiffs' injuries. On that appeal, plaintiffs had asserted that UJA was equitably estopped from denying its control over the Camp. Plaintiffs argued that through its advertising, UJA had encouraged patronage of UJA-funded camps, including the Camp at issue here.

Upon completion of discovery, which included more than 16 depositions and years of document discovery, defendants renewed their motions for summary judgment. Plaintiffs opposed, and cross-moved for partial summary judgment. The following facts were adduced in support of this second set of summary judgment motions.

UJA is a philanthropic not-for-profit corporation from which the Camp received 10% of its operating budget. UJA also gave annual grants to the camp for scholarships to needy children. In addition, it gave "restricted" grants to the Camp for specific capital or program needs in response to the Camp's requests for certain items. UJA never directed that any project be undertaken, and it did not condition its grants on any method of operation or safety standards. However, UJA did have the Camp use its logo on their stationery and the Camp displayed UJA banners.

In support of its claim that UJA had a controlling interest in the Camp, plaintiffs submitted a brochure entitled "UJA Federation Camping." This lists the Camp among those sponsored by UJA. Another UJA pamphlet, introduced by plaintiffs on the motions, states: "our well supervised facilities offer hiking, swimming, arts & crafts, sports, and just about every other activity under the sun."

On one day each summer, called "Federation Day," UJA representatives visited the camp. The parties contest the nature of the visit. Plaintiffs allege that UJA used the day to conduct an inspection of the facilities and operation of the camp. UJA countered that its activities on Federation Day were limited to determining the need for specific allocations, that is, to

ascertaining how much money the camp needed based upon the number of campers and the general working of the facility.

It is uncontested, however, that none of the Camp's officers or directors were representatives of UJA. Nor does UJA own, operate or manage any aspect of the Camp's property.

FOJP is a not-for-profit corporation which is affiliated with UJA. At the time of the accident, it provided risk management, insurance advice and insurance to many recipients of UJA funding. Plaintiffs allege that FOJP received a separate service fee from the Camp for its safety and security services. Plaintiffs also claim that the safety inspections or "surveys" FOJP performed were not conducted by its risk management group, but by a separate department of the company.

However, the record shows that FOJP provided only safety surveys and suggestions to the camp during the time that it served as its insurer. This is demonstrated by at least two letters in the record from Robert DeServio, the director of safety and security at FOJP to Rabbi Kaminetsky, the executive director of the Camp. The first, dated September 5, 1990, contained the following introductory paragraph: "These recommendations are intended to help identify hazards which may lead to injuries or other type losses [sic] and, propose hazard control methods. In some instances, there may be alternate ways of controlling a hazard and I am available to discuss these with you . . . [R]epair and replacement of old structures and equipment can help to avoid situations in which a hazardous condition contributes to an injury or other type of loss." The letter then delineated potential hazardous conditions in the Camp facilities. It included the following warning: "(9) (c) The water depth should be indicated on docks and be obvious both from the dock and in the water area. No diving signs should be posted where inappropriate [sic]."

The second letter, dated August 6, 1991, discusses an inspection of the premises Mr. DeServio conducted on August 1, 1991, days before Elisha's accident. In that letter, Mr. DeServio gave the executive director of the Camp 13 recommendations regarding the Camp facilities. Recommendation number 11 read: "*Rec # 11 Waterfront*: The water depth should be indicated on docks and be obvious from the dock and in the water area. 'No diving' signs should be posted where appropriate. (At the time of this visit [8/1/91] one dock had appropriate identification although the other[s] [sic] had numbers which were too small to be visible)." The safety surveys ceased when the Camp stopped using FOJP as its insurance provider.

In opposition to defendants' motions, and in support of a

cross motion for partial summary judgment, plaintiffs submitted transcripts from the depositions of a number of witnesses, including plaintiff Elisha Kobre, individuals affiliated with the Camp, UJA and FOJP. Plaintiffs also provided documentary evidence concerning the water levels at the lake, and an expert affidavit.

The IAS court determined that based upon the record before it, UJA and the Camp were significantly intertwined, such that factual issues precluded a determination as to whether UJA and FOJP owed plaintiffs a duty of care. The court also concluded that there were unresolved issues: whether UJA was on notice of an unsafe condition at the waterfront; whether FOJP was conducting safety surveys to avoid insurance losses; and, whether Elisha's injuries were proximately caused by either UJA or FOJP's negligence. It therefore denied both defendants' motions and plaintiffs' cross motion. Defendants appeal, and we reverse.

Contrary to plaintiffs' contention, the court properly exercised its discretion in entertaining defendants' renewed motions for summary judgment. Plaintiffs consented to extending defendants' time to submit their second motions, and in so doing, waived any objection to consideration of the motion on the merits. Further, while successive motions for summary judgment are generally disfavored, significant discovery took place here, including more than 16 depositions and numerous document exchanges (*see Fielding v Environmental Resources Mgt. Group*, 253 AD2d 713 [1998]). This placed the court in a far better position to determine the critical issue of whether UJA and FOJP had the degree of control over the activities at the Camp necessary to create a duty of care to Elisha (*see Olszewski v Park Terrace Gardens, Inc.*, 18 AD3d 349, 350 [2005] [subsequent motion for summary judgment not precluded where new evidence produced that was not available at the time of the prior motion]; *Sansol Indus. v 345 E. 56th St. Owners*, 276 AD2d 370 [2000] [same]).

A threshold question in any negligence action is whether the defendant owes a legally cognizable duty of care to the plaintiff in relation to the acts and omissions claimed (*see Hamilton v Beretta U.S.A. Corp.*, 96 NY2d 222, 232 [2001]). The Court of Appeals has stated that the resolution of this issue is for the court, not the jury (*Darby v Compagnie Natl. Air France*, 96 NY2d 343, 347 [2001] ["(C)ourts identify what people may reasonably expect of one another. In assessing the scope and consequences of civil responsibility, they define the boundaries of 'duty' to comport with what is socially, culturally, and economically acceptable" (citations omitted)]).

In deciding whether a duty is present here, it is instructive to look at the facts of *Darby*. There, plaintiff's decedent drowned while swimming at the Copacabana Beach, a public facility in Rio De Janeiro, Brazil. Plaintiffs had been vacationing at the Meridien Copacabana Hotel, located across the street from the government-owned beach. The hotel marketed its proximity to the beach and encouraged guests to utilize it (*id.* at 349). The hotel provided beach chairs, umbrellas and towels, and a security escort (*id.*). However, while the hotel distributed flyers regarding sun exposure and crime on the beach, it did not warn of the dangerous surf and the riptide (*id.*).[2] Plaintiffs alleged that the hotel's failure to warn about the dangerous surf constituted actionable negligence.

The Court of Appeals declined to extend a duty of care to the hotel. It found that the Brazilian government, not the hotel, was the owner and in sole control of the beach and its maintenance (*id.* at 349). The Court further held that providing beach-related services, did "not make the hotel the insurer of its guests' safety at a locale over which it ha[d] no control" (*id.*). Further, the Court concluded that the hotel's choice to warn guests about sun exposure and crime did not create a duty to warn against hazards of the sea (*id.*).

Like the hotel owner in *Darby*, UJA or FOJP, two charitable organizations which provided financial and insurance-related assistance to the Camp, did not have a duty to the plaintiffs with respect to the hazardous condition posed by shallow water levels near the Camp's lakeside docks. Neither UJA nor FOJP owned, managed or controlled the Camp's waterfront area, and there is no evidence, even through the restricted grant process, that UJA involved itself in specific waterfront safety projects. Responsibility for the lakefront rested solely with the Camp and its waterfront staff.

Similarly, FOJP did not have any responsibility for the daily operations of the Camp's waterfront. While FOJP did conduct safety surveys, the record conclusively establishes that the purpose of these surveys was to provide a risk management service akin to that of an insurer to reduce the risks which might give rise to liability under the policy.

The Court of Appeals discussed the question of duty in like circumstances in *Jansen v Fidelity & Cas. Co. of N.Y.* (79 NY2d 867, 868 [1992]). In that case, the plaintiff was injured while working at a construction site, and he brought a direct action

---

**2.** Although the Brazilian government employed lifeguards and rescue personnel, it did not convey surf information to area hotels (*id.* at 346).

against his employer's workers' compensation and liability insurance carrier (*id.* at 868). The insurance contract allowed, but did not require the insurer to provide safety inspections (*id.*). The plaintiff argued that once the insurer conducted those inspections, it was liable for conducting a "negligent inspection" (*id.*). Both this Court and the Court of Appeals rejected that argument. The Court of Appeals stated: "While it is true that one who assumes to act, even though not obligated to do so, may thereby become subject to the duty to act carefully, the application of this principle has been limited to 'those situations wherein the action taken is for the benefit of another and not in furtherance of the interest of the one who assumes to act' " (*id.* at 868-869 [citations omitted]). Here, as in *Jansen,* the "isolated language" in letters sent by Mr. DeServio to the camp executive director cannot support plaintiffs' allegation that the insurer had assumed a duty to them. As the Court of Appeals noted: "In context . . . the correspondence reveals that the [safety] inspections were undertaken in order to assist the employer in its program to reduce the insurer's exposure to claims; any benefit to the employer was incidental" (*id.* at 869).

While we are not unsympathetic to the grave nature of the injuries suffered by Elisha, the only conclusion to be drawn from this record is that neither UJA nor FOJP had sufficient control over the property or the activities at the Camp to impute a duty to defendants with respect to Elisha's accident. Concur—Mazzarelli, J.P., Saxe, Sullivan and Sweeny, JJ.