[963 NYS2d 6]

Teresa Wynn, as Administratrix of the Estate of Elouise Wynn Squire, Deceased, et al., Appellants, v Little Flower Children's Services, Respondent.

First Department, March 28, 2013

## APPEARANCES OF COUNSEL

*Ephrem J. Wertenteil*, New York City, for appellants.

*Shaub Ahmuty Citrin & Spratt*, Lake Success (*Robert M. Ortiz* and *Christopher C. Simone* of counsel), for respondent.

## OPINION OF THE COURT

ACOSTA, J.

■ We hold that a child care agency that retains legal authority over a child owes the foster parents a duty to take steps to remove the child where it is placed on sufficient notice by the foster parents that the child is a danger to their household and is asked to remove the child. We find, however, that the record in this case presents an issue of fact as to whether the agency was given the requisite notice. Thus, the agency's motion for summary judgment dismissing the complaint must be denied.

Defendant, Little Flower Children's Services, is a child care agency operating in New York City. In mid-1993, Little Flower placed Glenn G., age 6, and his sister, Shantel G., age 4, in foster care with plaintiff's decedent Elouise Wynn Squire. Elouise lived with her husband, plaintiff's decedent Victor Squire. Elouise entered into a "Foster Parents Agreement" with Little Flower which provided that the agency retained legal custody of Glenn and required Eloise, inter alia, to notify it "immediately" if, for any reason, she could no longer care for Glenn in order to give the agency "as much time as possible" to effect a change in the child's placement.

Little Flower's "Foster Care Program Manual" stated that the agency would not accept for placement children who were "firesetter[s]," because these "characteristics" were outside of the program's intake criteria. The Program Manual provided for "[e]mergency [t]ransfers" of children to other foster homes on account of "emergency situation[s]."

After about a month in Elouise's care, Glenn began presenting behavioral problems, including engaging in sexual behavior with Shantel, disobeying Elouise, and hitting schoolmates. Elouise complained to Little Flower caseworkers about Glenn's behavior during their visits to her home and on visits to Little Flower's office.

According to Elouise's daughter, Teresa, one day in August 1993, while she was caring for Glenn and Shantel in her home, she smelled smoke. She went to the kitchen and saw Glenn setting paper towels on fire, using the stove's burner. Upon seeing Teresa, Glenn threw the paper towels on the floor and ran into another room. Teresa extinguished the flames and called her mother to tell her what had happened.

Teresa testified that Elouise called Gloria Warnee Coleman (Glenn's caseworker), and told her what had happened. Teresa was at Elouise's apartment the next day, when Coleman went to visit Elouise. Coleman told Glenn that he was not to play with the stove or matches. Teresa and Elouise then asked Coleman to have Glenn removed from Elouise's home. Coleman responded that the agency would take care of it, but that it took time to find a suitable home.

According to Teresa, not long afterwards, she was present in Elouise's apartment when Glenn started another fire, using matches or a lighter to ignite clothing in a hallway closet. Teresa saw smoke coming from the closet, and she and Elouise poured water on the burning clothing. Elouise called the agency to

report what had happened. She later told Teresa that Coleman and another caseworker visited her the next day to discuss the second fire.

Notably, however, Elouise's son Melvin, who lived with Elouise during the relevant time period, denied that Glenn ever set a fire in his mother's closet.

Carol, another of Elouise's daughters, testified that, at some point after September 1993, while she was in the bathroom during a visit to her mother's apartment, she "smell[ed] matches." She emerged from the bathroom and saw that Glenn had lit a match in his bedroom, and was still holding a book of matches. Carol told Glenn that he should not play with matches, and took the matches away from him. She went to the kitchen and told Elouise what had happened. Elouise called Little Flower and reported that Glenn had been playing with matches.

Teresa testified that, after the matches incident (the third fire), she and Elouise went to Little Flower three times to request that the agency remove Glenn from Elouise's home. Teresa also complained to Coleman and two other caseworkers (Mr. Targ and Mr. Sears) that Glenn needed to be removed from the home and that the agency was "[d]ragging [its] feet."

Melvin testified that Elouise called the agency to complain about Glenn's fire-starting propensities. Notably, however, he denied that his mother ever asked the agency to remove Glenn from her home.

At about 5:00 p.m. on March 22, 1994, Carol and her siblings, Ernest and Joann, visited their mother. Elouise, Victor, Glenn, Shantel, and Carol's daughter, Bianca, were all home. Carol, Ernest, and Joann left the apartment at about 6:30 p.m. When Carol returned about an hour later she saw smoke coming through the door. She knocked on the door and attempted to open it, but the knob was so hot it burned her hand. As she banged on the door, Glenn opened it from the inside and ran out.

Carol tried to enter the apartment, but was prevented by the smoke and flames. She went to a neighbor's apartment, upstairs, and called 911 and her sister, Teresa. Firefighters arrived and removed Elouise, Victor, and Bianca from the still-burning apartment. Carol then went downstairs through the smoke-filled hallway and outside, where she lost consciousness. When Teresa arrived, she saw Carol lying on the ground unconscious. Teresa testified that she heard Glenn tell police officers that he had set the fire.

Meanwhile, a neighbor called Melvin to tell him that his apartment was on fire, and Melvin rushed home. He saw smoke pouring out of the window and Glenn outside with his hands burned. No emergency personnel were present yet. Melvin called 911, and then asked Glenn how the fire had started. Crying, Glenn said that he had set a mattress on fire with matches. Later, at the hospital, Glenn told Teresa that he "didn't mean" to "set the mattress on fire." Fire Department records indicate that, on the night of the fire, Glenn told a fire marshal at the hospital that he set a mattress in the hallway on fire, using a lighter that he took from the kitchen table. The Fire Department investigation confirmed that the fire started on a mattress in the hallway of the apartment.

Victor died from his burns on March 23, 1994. Elouise died five days after the fire, and Shantel died about two weeks after the fire. Bianca survived, with severe scarring to her face and arm.

Coleman testified that Glenn was removed from the home of his previous foster parent, who had complained that Glenn was sexually aggressive towards Shantel. In accordance with agency policy, Little Flower transferred Glenn and Shantel to Elouise, within 10 days of receiving this complaint.

Glenn lived with Elouise for about six months before the fatal fire. During this time, Coleman visited Elouise's apartment about 10 times. At least two of these visits were in response to complaints that Glenn had hit someone in school and had acted out sexually with his sister. In stark contrast to Teresa's and Carol's assertions, however, Coleman denied ever receiving any complaint about Glenn starting fires or any request to remove him from Elouise's home. Coleman spoke to Glenn after the fatal fire, and Glenn admitted that he started it.

Records produced by Little Flower of all complaints about Glenn made during his time with Elouise indicate that the agency recorded numerous complaints about Glenn (ranging from pulling toys out of the garbage to "sexually acting out" with Shantel). There is, however, no record of any complaint of Glenn starting a fire.

Little Flower moved for summary judgment dismissing the complaint on the grounds that it had no duty to protect foster parents against torts committed by their foster children and that, even if it had such a duty, it lacked notice of Glenn's propensity for starting fires.

A defendant may be liable in negligence only where it owes a duty of care to the plaintiff (*see Pulka v Edelman*, 40 NY2d 781, 782 [1976]). In general, a defendant will not be liable for the conduct of third persons who cause harm to others (*Hamilton v Beretta U.S.A. Corp.*, 96 NY2d 222, 233 [2001]). However, the duty to control a third person's conduct may arise when the defendant has authority to do so, and because of either the relationship between the defendant and the third person or the relationship between the defendant and the plaintiff (*id.*). An example is the parent-child relationship (*see id.*).

Thus, a child care agency, acting in loco parentis, has a duty to exercise reasonable care to prevent foster children under its supervision and control from harming others (*see DiCarlo v City of New York*, 286 AD2d 363 [2d Dept 2001]), except during times when the children are in the physical custody of another entity, such as a school (*see Howard v Parsons' Child & Family Ctr.*, 306 AD2d 725, 726 [3d Dept 2003]; *Cappello v St. Christopher's, Jennie Clarkson Child Care Servs.*, 282 AD2d 566 [2d Dept 2001]).

Of course, Little Flower, while it retained legal control over Glenn, had relinquished day-to-day physical custody and control of him to Elouise, and by analogy to *Howard* and *Cappello*, it arguably had no duty to protect her from harm caused by him. The analogy, however, is not complete. We find that even if Little Flower did not have a duty to control Glenn while he was in Elouise's physical custody, it nonetheless had a duty to remove him from her home upon notice of his propensity for setting fires and upon her request. Indeed, the Foster Parents Agreement requires the foster parent to notify the agency immediately if she can no longer care for the child to give the agency "as much time as possible" to change the child's foster placement, and caseworker Coleman testified that it was the agency's practice to effect a transfer within 10 days of receiving such notice. Moreover, the Program Manual states that the agency will not accept a child who is a "firesetter" for placement.

In determining that a "duty to remove" may exist, we have considered "the reasonable expectations of parties and society generally, the proliferation of claims, the likelihood of unlimited or insurer-like liability, disproportionate risk and reparation allocation, and public policies affecting the expansion or limitation of new channels of liability" (*Hamilton*, 96 NY2d at 232 [internal quotation marks omitted]). We are "mindful of the

precedential, and consequential, future effects of [this] ruling[ ], and limit the legal consequences of [the] wrongs [at issue] to a controllable degree" (*see id.* [internal quotation marks omitted]).

We find that Elouise had a reasonable expectation that a firesetter would not be placed in her home. Indeed, it was Little Flower's policy not to place children who were "firesetters." Society too has a reasonable expectation that a firesetter will be removed from a foster home upon notice of the child's firesetting propensities and upon the foster parent's request. A child care agency is not simply a distribution center; it must consider each child's special needs and the foster parents' ability to care for those needs (*see* 18 NYCRR 430.11 [d] [2]; *see also* New York State Department of Social Services 1988 Model Foster Parent Manual at 3, available at http://ocfs.ny.gov/main/policies/external/1988/INFs/1988%20INF-40%20part%201%20-%20The%201988%20Model%20Foster%20Parent%20Manual.pdf [foster parent must be able to "provide for the physical, emotional, social, and educational needs of children who may be placed in the home"]; New York State Office of Children and Family Services 2010 Foster Parent Manual at 12, available at http://www.ocfs.state.ny.us/main/publications/Pub5011.pdf ["In placing a child in a foster home, agency staff try to find a home that best suits the child's needs," by considering, among other factors, whether "the child (has) special physical, *psychological,* or medical needs that require a foster home that is equipped and trained to handle them" and whether the foster home can meet the child's "specific emotional needs" (emphasis added)]).

There is no indication in the record that recognizing a duty to remove in these circumstances would lead to a proliferation of claims against child care agencies or given defendant's internal policy against placing firesetters, and caseworkers' monitoring of their agency's foster children in general, that unlimited or insurer-like liability would likely ensue since a child could be removed at the earliest signs of firesetting propensities, or at least when the foster parents asked to have the child removed because of firesetting propensities. Indeed, there appears to be a disproportionate risk to foster parents who unknowingly take on a firesetter and then have their pleas for the agency to remove the child ignored.

With respect to reparation allocation, the agency is in the best position to remove the child from the home of foster parents who are incapable of dealing with him and place him in a set-

ting where his individual needs can be met. Moreover, public policy favors imposing the duty to remove a child from a home of foster parents who are not equipped to deal with a child's dangerous propensities, for the sake of the safety of both the child and the parents.

Thus, on balance, the relevant factors support the imposition on a child care agency of a duty to remove a child from the home of foster care parents who are incapable of dealing with a child's dangerous propensities and have asked the agency to remove the child immediately. This conclusion is consistent with the requirement "that the damaged plaintiff be able to point the finger of responsibility at a defendant owing, not a general duty to society, but a specific duty to him [or her]" (see Johnson v Jamaica Hosp., 62 NY2d 523, 527 [1984]; see also Lauer v City of New York, 95 NY2d 95, 100 [2000]; Palsgraf v Long Is. R.R. Co., 248 NY 339, 341 [1928]). Little Flower itself acknowledged the dangerousness of a child's propensity to set fires, and foresaw precisely the kind of eventuality presented here. The duty to remove is thus specific and narrow in scope.

■ Having found a duty to remove on Little Flower's part, we turn to whether Little Flower breached the duty. We find that the record does not permit a determination as a matter of law. While the agency's records do not refer to Glenn's firesetting propensities or to a request by Elouise that he be removed from her home, there is testimonial evidence that Elouise and her daughters told agency caseworkers that Glenn had set fires and asked the agency to remove him. Contrary to the motion court's finding, this testimony is not inadmissible hearsay. The testimony is based on the witnesses' firsthand observations. Moreover, Elouise's statements to the agency about the fires were offered not for their truth, but to demonstrate that the agency was on notice of the child's propensity to set fires (see Stern v Waldbaum, Inc., 234 AD2d 534 [2d Dept 1996]). Even assuming that the out-of-court statements are hearsay, they need not be rejected, because they are not the only evidence submitted in opposition to Little Flower's motion (see Guzman v L.M.P. Realty Corp., 262 AD2d 99, 100 [1st Dept 1999]). For example, Teresa testified that she and Eloise asked caseworker Coleman to remove Glenn from Elouise's home.

Nor, contrary to Little Flower's argument, is this testimony incredible as a matter of law. The chief inconsistency identified by the agency is that between Teresa's and Carol's testimony and Melvin's testimony. This inconsistency presents issues of

credibility, which is the function of a jury, not the court on a motion for summary judgment, to resolve. A jury may ultimately find that Elouise never placed Little Flower on notice of Glenn's firesetting propensities or asked that he be removed, but that finding is solely for the jury to make. Similarly, whether, as the motion court found, Elouise was partly at fault for disconnecting smoke detectors on the night of the fire or for leaving matches where Glenn would have access to them is for the jury to decide, assuming evidence sufficient to support such findings is placed before them at trial.

Accordingly, the order of the Supreme Court, Bronx County (Kenneth L. Thompson, Jr., J.), entered on or about March 23, 2011, which granted defendant's motion for summary judgment dismissing the complaint, should be reversed, on the law, without costs, and the motion denied. Appeal from order, same court and Justice, entered August 17, 2011, which denied plaintiffs' motion to renew, should be dismissed, without costs, as academic in light of the foregoing.

MAZZARELLI, J.P., SAXE, RENWICK and CLARK, JJ., concur.

Order, Supreme Court, Bronx County, entered on or about March 23, 2011, reversed, on the law, without costs, and the motion denied. Appeal from order, same court and Justice, entered August 17, 2011, dismissed, without costs, as academic in light of the foregoing.