DISTRICT OF COLUMBIA, Appellant,

v.

BERETTA, U.S.A., CORP.,
et al., Appellees.

Bryant LAWSON, et al., Appellants,

v.

BERETTA, U.S.A., CORP.,
et al., Appellees.

No. 03–CV–24, 03–CV–38.

District of Columbia Court of Appeals.

Argued March 2, 2004.
Decided April 29, 2004.

James C. McKay, Jr., Senior Assistant Corporation Counsel, with whom Robert J. Spagnoletti, Corporation Counsel, Charles L. Reischel, Deputy Corporation Counsel at the time the brief was filed, and Edward E. Schwab, Acting Deputy Corporation Counsel at the time of argument, were on the brief, for appellant in No. 03–CV–24.

David S. Molot, Washington, with whom A. Stephen Hut, Jr., John Payton, Eric J. Mogilnicki, R. Kevin Bailey, Karen C. Daly, Roderick V.O. Boggs, Lois G. Williams, and Susan E. Huhta were on the brief, for appellants in No. 03–CV–38.

Thomas E. Fennell and Lawrence S. Greenwald, with whom Michael L. Rice, James A. Wilderotter, Paul R. Reichert, Lawrence P. Fletcher–Hill, Catherine A. Bledsoe, Robert E. Scott, Jr., Lauren Lacey, William M. Griffin, III, Jonann E.

Coniglio, Paul F. Strain, M. King Hill, III, James P. Dorr, Sarah L. Olson, John F. Renzulli, Leonard Rosenbaum, Charles L. Coleman, III, Warwick R. Furr, II, Michael C. Hewitt, Michael J. Zomcik, Robert C. Tarics, Michael Branisa, Gerald F. Ivey, Amanda L. Rixse, Timothy A. Bumann, Paul Schleifman, Jeffrey S. Nelson, and Tina Schaefer were on the brief, for appellees.

Dennis A. Henigan and Brian J. Siebel, Washington, filed a brief as amicus curiae on behalf of the Brady Campaign to Prevent Gun Violence.

Roy T. Englert, Jr., Alan E. Untereiner, Jan S. Amundson, and Quentin Riegel filed a brief as amicus curiae on behalf of the National Association of Manufacturers.

James M. Beck, Frank J. Eisenhart, J. Gregory Dyer and Hugh F. Young, Jr., filed a brief as amicus curiae on behalf of the Product Liability Advisory Council, Inc.

Before TERRY and FARRELL, Associate Judges, and PRYOR, Senior Judge.

FARRELL, Associate Judge:

The District of Columbia and nine individual plaintiffs appeal from the dismissal of their suit against manufacturers or distributors of firearms alleging negligent distribution, public nuisance, and strict liability under D.C.Code § 7–2551.02 (2001). In a comprehensive written opinion, the trial judge entered judgment on the pleadings for the defendants on all counts, ruling in substance that the counts of negligence and public nuisance failed basic tests of duty, foreseeability, and remoteness as pleaded; that the District of Columbia could not bring an action under § 7–2551.02; and that, as to the individual plaintiffs, the statutory tort was insufficiently pleaded and, in any event, is an unconstitutional exercise of extra-territorial regulation by the Council of the District of Columbia.

We reverse the dismissal of the statutory count as to the individual plaintiffs, holding that they may advance to discovery on strict liability notwithstanding the difficulties of proof they may confront. We also reverse the dismissal of that count as to the District of Columbia to the extent—but only the extent—that it seeks subrogated damages as to named individual plaintiffs for whom it has incurred medical expenses. Otherwise we sustain the judgment of the trial court, holding that none of the plaintiffs has stated a valid claim of common-law negligence and the District has not stated a claim of public nuisance on the facts alleged.

## I. Background

This is the second time in the District of Columbia that an actionable link has been attempted to be drawn between the manufacture or distribution of firearms and the criminal use of those weapons to kill or injure. *See Delahanty v. Hinckley*, 564 A.2d 758 (D.C.1989) (on certified question from federal court, finding no basis on facts alleged for holding gun manufacturers and their officers liable under D.C. law for criminal use of gun by John W. Hinckley, Jr.). The plaintiffs in the present case are the District of Columbia government and nine individual persons who themselves were wounded or represent decedents who were shot and killed by persons unlawfully using firearms in the District of Columbia.[1] The defendants are numerous

---

1. To illustrate, the complaint alleges that plaintiff Bryant Lawson was shot by a semiautomatic firearm in early 1997 as he tried to flee from three armed men, all of whom were subsequently convicted of aggravated assault or related crimes arising from the shooting. As a result of the shooting, Lawson is a quadriplegic and suffers other ill effects of his disabling injuries.

manufacturers, importers, or distributors of firearms. Underlying all three counts of the complaint are allegations that may be summarized as follows: Although the District of Columbia itself has stringent gun control laws, there nonetheless exists an unchecked illegal flow of firearms into the District to which the defendants by action and inaction have contributed. This flow of guns takes place in numerous ways, including "straw purchases" (purchases from licensed dealers on behalf of other persons not qualified to buy under applicable law), multiple sales (multiple purchases over a short stretch of time by persons intending to sell or transfer to others not qualified to buy), sales by the defendants to "kitchen table" dealers licensed to sell but who do not do so from retail stores, and gun show sales by sellers who typically lack federal firearm licenses and are not required to do purchaser background checks.

The complaint alleges that the defendants have distributed their firearms without adequate self-regulation or supervision in order to increase firearm sales, knowing or constructively knowing that they are creating, maintaining, or supplying the unlawful flow of firearms into the District and similarly knowing that those guns will be used to commit crimes such as the ones that have caused death or injury to the individual plaintiffs or persons they represent. The complaint further alleges numerous illustrative means by which the defendants are able to restrict or impede the unlawful flow of firearms into the District but have not done so. These include (to name just three) directing and encouraging their distributors and dealers to refuse to sell in circumstances where the dealer knows or should know that the buyer seeks to make a straw purchase; requiring such dealers to refuse to sell more than one handgun a month to any person not holding a federal firearms license; and requiring their distributors to sell only to "stocking dealers," *i.e.*, retailers who stock guns from retail stores, and not to "kitchen table" dealers or at gun shows.

Based on these general allegations, Count I of the complaint (Strict Liability) alleged that the defendants are liable to the District of Columbia under D.C.Code § 7–2551.02 and related statutes for health care costs, Medicaid expenses, and other costs of assistance and compensation paid by the District to or on behalf of victims of gun violence including civilians, police officers, and firefighters, and are liable to the individual plaintiffs for direct and consequential damages proximately caused by the defendants' conduct. Count II (Negligent Distribution) alleged that the defendants breached "a duty to the District and its residents not to create an unreasonable risk of foreseeable harm from the distribution of their firearms, and to take reasonable steps to limit this risk once it had been created." In Count III (Public Nuisance) the District alone alleged that the defendants have "created an ongoing public nuisance of readily available handguns and machine guns that unreasonably interferes with District residents' enjoyment of health, safety, and peace."

## II. Standard of Review

▮▮▮ The defendants moved for judgment on the pleadings as to all counts, Super. Ct. Civ. R. 12(c), and the trial judge granted the motion and dismissed each count for failure to state a claim for which relief can be granted. Rule 12(b)(6); *see Osei–Kuffnor v. Argana,* 618 A.2d 712, 713 (D.C.1993) (standards same for dismissal under Rule 12(b)(6) and judgment under Rule 12(c)). In reviewing that decision, this court "conducts a *de novo* review of the record, construing all facts and inferences in the light most favorable to the plaintiff[s] and taking the complaint's allegations as true." *Duncan v. Children's Nat'l Med. Ctr.,* 702 A.2d 207, 210 (D.C.

1997). A complaint may not be dismissed because the court merely "doubts that [the] plaintiff[s] will prevail on a claim," *id.* (citation omitted), but "dismissal for failure to state a claim may properly be granted where it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [the] claim which would entitle [them] to relief." *Id.* (citation and quotation marks omitted).

Applying these standards, we consider first the two common-law counts alleged, then the statutory count as it relates to each of the two classes of plaintiffs.

## III. Negligent Distribution

The trial court dismissed the count of negligent distribution primarily on the basis of *Delahanty, supra. See* Mem. Op. and Order at 25 ("Based upon the fundamental concept of *stare decisis,* this Court is required to apply *Delahanty.* On the common law negligence claims, this Court is simply not free to do otherwise."). *Delahanty* indeed poses a large obstacle to the plaintiffs' attempt to plead negligence for harm resulting from the unlawful actions of third parties. *Delahanty* came before this court as a certified question from the United States Court of Appeals asking "whether, in the District of Columbia, 'manufacturers and distributors of Saturday Night Specials may be strictly liable for injuries arising from these guns' criminal use.'" *Delahanty,* 564 A.2d at 759 (citation omitted). Our answer to that question ranged more widely, however. We pointed out that, although "[t]he certifying court focused on whether this court would adopt the strict liability theory described in *Kelley* [*v. R.G. Indus.,* 304 Md. 124, 497 A.2d 1143 (Md.1985) ]," that court noted that " 'the theoretical underpinnings [of *Kelley* ] are somewhat unclear' and that the certified question was not intended to restrict this court to a particular rationale for this cause of action." *Delahanty,* 564 A.2d at 760 (citation omitted).

Further, because this court is "not limited to the designated question of law [in any event] but may 'exercise our prerogative to frame the basic issues as we see fit for an informed decision,' " and because the *Delahanty* appellants were not relying "exclusively on the *Kelley* theory but have continued to advance in this court all the theories in their complaint," we "expand[ed] our inquiry to include the question whether established theories of tort law in the District of Columbia provide a cause of action against gun manufacturers and distributors for injuries arising from the guns' criminal uses." *Id.* (citation omitted).

Just as the federal District Court had dismissed the entire complaint for failure to state a claim, this court "reject[ed] each of the theories appellants have advanced in the federal courts and in this court." *Id.* We rejected first their theory of strict liability for sale of a defective product, based not on a claim of defective design or manufacture—no such claim was advanced—but on the assertion "that the manufacturers had a duty to warn of the dangers of criminal misuse of the gun." There is no duty to warn, we answered, when a potential danger is known and recognized, and "[b]ecause hazards of firearms are obvious, the manufacturer had no duty to warn." *Id.* (citing *inter alia* RESTATEMENT (SECOND) OF TORTS § 402A cmt. j). We paused only slightly longer over the appellants' attempt to apply the theory of "abnormally dangerous activity," *see* RESTATEMENT § § 519, 520, to the marketing of guns. That cause of action, we explained,

> applies only to activities that are dangerous in themselves and to injuries that result directly from the dangerous activity. The marketing of a handgun is not dangerous in and of itself, and when injury occurs, it is not the direct result

of the sale itself, but rather ... of actions taken by a third party.

*Delahanty,* 564 A.2d at 761 (citation and quotation marks omitted). We again emphasized that "any likelihood that ... harm will be great ... would result from the use, not the marketing as such, of handguns." *Id.* And we rejected for similar reasons the "social utility" theory of tort adopted by the Maryland courts in *Kelley, supra*—"requiring proof that the danger of the product outweighs its social utility and that no legislative imprimatur be associated with the product to the contrary," *id.*—pointing out, among other things, that the appellants' attempt to make actionable the manufacture or distribution of "a certain class of inexpensive and allegedly unreliable handguns" (*i.e.,* Saturday Night Specials) ignored the fact that "[a]ll firearms are capable of being used for criminal activity." *Id.* at 761–62 (citation and internal quotation marks omitted).

Finally, we rejected the cause of action for negligent manufacture or distribution, explaining:

"In general no liability exists in tort for harm resulting from the criminal acts of third parties, although liability for such harm sometimes may be imposed on the basis of some special relationship between the parties." *Hall v. Ford Enters., Ltd.,* 445 A.2d 610, 611 (D.C.1982); *see also Kline v. 1500 Massachusetts Ave. Apartment Corp.,* 141 U.S.App. D.C. 370, 375–76, 439 F.2d 477, 482–83 (1970) (relationships giving rise to a duty of protection include landlord to tenant, school district to student, employer to employee, and hospital to patient); *District of Columbia v. Doe,* 524 A.2d 30, 32 (D.C.1987) (school to student). We are not inclined to extend the rationale of these decisions to the present case. Appellants have alleged no special relationship with the gun manufacturers and have suggested no reasonable way that gun manufacturers could screen the purchasers of their guns to prevent criminal misuse.

*Delahanty,* 564 A.2d at 762.

Although our rejection of liability in *Delahanty* rested throughout on the absence of a direct link between the manufacture or distribution of guns and injuries caused by the criminal misuse of those weapons, it is especially the refusal "to extend the rationale of [our] decisions" to the negligence theory alleged there that appears to bar the plaintiffs' claim of negligent distribution here. For this reason, the plaintiffs understandably seek to distinguish *Delahanty* by arguing, for example, that the negligence discussion was *dictum* given the precise phrasing of the D.C. Circuit's question. The fact, however, that we "expand[ed] our inquiry"—as the certifying court foresaw we might—to render "an informed decision" on the reach of "established theories of tort law in the District of Columbia," *id.* at 760, scarcely makes our analysis of any of those theories advisory. Such reasoning would make an entire subset of answers to certified questions—*i.e.,* those in which we exercise the "latitude" given us to "consider[ ] nondesignated questions and [to] reformulat[e], if necessary, ... [the] questions as certified," *Penn Mut. Life Ins. Co. v. Abramson,* 530 A.2d 1202, 1207 (D.C.1987)—non-binding *dicta,* contrary to our law that such answers are "*stare decisis* of this court." *Id.* Nor can we fairly truncate *Delahanty*'s holding as saying that a "special relationship with the gun manufacturers"—which is no more alleged here than in *Delahanty*—need be shown only if the plaintiffs allege no "reasonable ways" for manufacturers to effectively screen their purchasers, but not otherwise; that would make four-fifths of the *Delahanty* court's discussion of negligence, and of the limitations it recognized on "liability in tort for harm

resulting from the criminal acts of third parties," superfluous.

At bottom, the plaintiffs argue that *Delahanty* was wrongly decided because, contrary to its holding, District of Columbia law requires no "special relationship between the parties" to permit liability in negligence for criminal acts of others provided—to quote the District's brief—"such acts were foreseeable." The individual plaintiffs likewise assert that a legal duty can arise in this context even without a special relationship between the parties—such as landlord and tenant—if the defendant "realized or should have realized the likelihood" that his negligent conduct might "afford[ ] an opportunity to [a] third person to commit [an intentional] tort or crime, ... and that [such] a third person might avail himself of the opportunity." Br. for Indiv. Plaintiffs at 11 (quoting RESTATEMENT (SECOND) OF TORTS § 448 (1965)). We pass over the plaintiffs' implied invitation to overrule *Delahanty* (one not properly addressed to this division), as well as the question, probably unanswerable satisfactorily from our decisions, of whether a special relationship between a plaintiff and a defendant has to undergird any claim of negligence in the District based on harm stemming from the criminal acts of third persons. *But see Workman v. United Methodist Comm.*, 355 U.S.App. D.C. 131, 134, 320 F.3d 259, 263 (2003) (surveying this court's decisions and concluding that under them "the requirement that the defendant has been able to foresee that a third party would likely commit a criminal act ordinarily has, and perhaps must have, a relational component"). We nevertheless conclude that our decisions addressing general tort concepts of duty and foreseeability do not permit recognition of a claim for common-law negligence on the facts alleged here.

 Where an injury is caused by the intervening criminal act of a third party,

this court has repeatedly held that liability depends upon a more heightened showing of foreseeability than would be required if the act were merely negligent. In such a case, the plaintiff bears the burden of establishing that the criminal act *was so foreseeable that a duty arises to guard against it.* Because of the extraordinary nature of criminal conduct, the law requires that the foreseeability of the risk be more precisely shown.

*Potts v. District of Columbia*, 697 A.2d 1249, 1252 (D.C.1997) (citations and internal quotation marks omitted; emphasis added). In this context, then, the requisite duty of care required for negligence [2] is a function of foreseeability, arising only when foreseeability is alleged commensurate with "the extraordinary nature of [intervening] criminal conduct." *Id.*[3] And, as we further stated in *Potts*, "[o]ur opinions have made clear *the demanding nature of the requirement of 'precise' proof of a 'heightened showing of foreseeability'* in

2. "[T]o establish negligence a plaintiff must prove a duty of care owed by the defendant to the plaintiff, a breach of that duty by the defendant, and damage to the interests of the plaintiff, proximately caused by the breach." *District of Columbia v. Harris*, 770 A.2d 82, 87 (D.C.2001) (citations and internal quotation marks omitted).

3. In *Workman*, the D.C. Circuit noted the theoretically somewhat anomalous blending of duty and foreseeability in this court's decisions ("Ordinarily, the relationship between the parties is the key to determining whether the defendant had a legally enforceable duty to the plaintiff (or her decedent), whereas foreseeability is important to issues of proximate causation and conformity to the standard of care, issues that arise only after a duty has been found."), but that nevertheless "the D.C. courts have repeatedly spoken of the heightened foreseeability requirement in terms of duty." 355 U.S.App. D.C. at 137, 320 F.3d at 264.

the context of an intervening criminal act involving the discharge of weapons." *Id.* (citations omitted; emphasis added). The high-water mark, as it were, of a showing of facts sufficient to create a duty to protect against such conduct was in *District of Columbia v. Doe,* 524 A.2d 30 (D.C.1987), where the claim was that reasonable protective measures by the District of Columbia could have prevented a child from being raped at a District elementary school. Acknowledging the requirement of a heightened showing of foreseeability in that context, *id.* at 33, we nonetheless identified evidence specific to that school and surrounding area that "could be viewed by reasonable factfinders as enhancing the foreseeability of danger from intruders, thereby creating a duty on the part of District officials to protect the students from this type of criminal activity." *Id.* at 34.[4] In three succeeding cases, by contrast, we rejected liability as a matter of law where foreseeability (hence duty) was not limited by any evidentiary reference to a precise location or class of persons.

In *Clement v. Peoples Drug Store,* 634 A.2d 425 (D.C.1993), in which an employer was sued for negligence arising from the shooting death of one of its employees in the store parking lot, "the only evidence presented with respect to [the] shooting's foreseeability was an expert's opinion based on police reports of criminal activity in the surrounding area. No evidence was introduced involv[ing] any gun-related incidents at the particular shopping mall in which the shooting occurred." *Potts,*

697 A.2d at 1252 (summarizing basis for *Clement*'s holding). In *Bailey v. District of Columbia,* 668 A.2d 817 (D.C.1995), where the plaintiff was shot after attending a cheerleading competition at a junior high school as she was leaving the building, she offered the affidavit of witnesses who asserted that the neighborhood around the school was a "high drug area" and that shootings and other criminal acts had taken place there. Rejecting this showing as insufficient, we explained that "[a]lthough the occurrence of shootings in, and in the vicinity of, the District's public schools is an unhappy reality, ... such 'generic information,' by itself, does not create a duty on the part of the District to protect against the use of firearms under the circumstances presented here." *Id.* at 820.[5] Finally, in *Potts, supra,* the plaintiffs were injured by gunshots from an unknown source as they were leaving the Washington Convention Center (WCC) after attending a boxing event organized by Spencer Promotions, Inc. They sued the organizer and (among others) the District of Columbia for negligence. Relying principally on *Bailey* and *Clement,* we sustained a grant of summary judgment because "plaintiffs [had] proffered no evidence of any prior gun-related violence at any other event held at the WCC or promoted by Spencer Promotions, nor any other specific evidence bearing directly on the foreseeability of the shooting incident at issue here." 697 A.2d at 1252.

**4.** In particular, there was evidence that "crimes against persons [had been committed] in and around the school ... [including] a robbery on the school's playground; sexual assaults and other violent activity [had occurred] in the surrounding area"; and the school security system was defective due to an open rear gate, doors that would not lock, and a malfunctioning intercom, permitting

"adult males [to] freely roam[] throughout the school." *Doe,* 524 A.2d at 34.

**5.** In particular, "there was no evidence of prior gun-related violence or assaults occurring at the school or [even] at any of the many cheerleading competitions that had been held anywhere in the city." *Bailey,* 668 A.2d at 821.

■ *Potts, Bailey,* and *Clement* were decided on summary judgment rather than a motion to dismiss, but they demonstrate the tight boundaries—requiring " 'precise' proof of a 'heightened showing of foreseeability,' " *Potts,* 697 A.2d at 1252—within which a claim of common-law negligence must be framed in this jurisdiction "in the context of an intervening criminal act involving the discharge of weapons." *Id.* The plaintiffs in this case broadly allege a duty and foreseeable harm to "the District [of Columbia] and its residents." Complaint, ¶ 151. That duty is unlike even the one claimed to be owed sub-classes of residents (shoppers at a particular store, children at a given school, attendees of a particular event) regarding whom we have repeatedly said that "generic" proffers of foreseeability do not suffice to create a duty of care. The class to whom the defendants allegedly owed a duty here is potentially unlimited except by the population of the District of Columbia, any member of which could be a shooting victim. The class of defendants is likewise potentially open-ended because the identity both of the firearm and of the manufacturer of guns used criminally in the District will often, if not invariably, be a matter of happenstance. This indeterminacy of both the plaintiff and the defendant class, as other courts have recognized, results from the sheer number of ways in which firearms, despite any reasonable precautions manufacturers can be expected to take, may reach the hands of criminal wrongdoers—the sheer number of causal links,

in other words, between the licensed manufacture and distribution of firearms and their use to kill or injure others. This court's decisions, we conclude, do not permit recognition of a common-law tort resting on such limitless notions of duty and foreseeability. *See also Lacy v. District of Columbia,* 424 A.2d 317, 321 (D.C.1980) (citation and internal quotation marks omitted) (recognizing, as a matter of "policy," the existence in our law of "various liability-limiting considerations which relieve the defendant of liability for harm he actually caused where the chain of events appears highly extraordinary in retrospect").[6]

Among courts rejecting claims of negligent distribution of firearms similar to the plaintiffs', the New York Court of Appeals in *Hamilton v. Beretta, U.S.A., Corp.,* 96 N.Y.2d 222, 727 N.Y.S.2d 7, 750 N.E.2d 1055 (2001), has provided the most cogent analysis. Like our *Delahanty* decision, *Hamilton* answered certified questions of law from the federal Circuit Court, including whether under New York decisional law, "the defendants owed plaintiffs a duty to exercise reasonable care in the marketing and distribution of the handguns they manufacture." *Id.* at 1059. The federal District Court had "imposed a duty on gun manufacturers 'to take reasonable steps available at the point of . . . sale to primary distributors to reduce the possibility that these instruments will fall into the hands of those likely to misuse them.' " *Id.* at 1061 (citation omitted). The New York Court of Appeals rejected that duty

---

**6.** *District of Columbia v. Carlson,* 793 A.2d 1285 (D.C.2002), does not help the plaintiffs. It concerned the District's duty to maintain in working condition traffic signals installed at intersections with pedestrian crosswalks. The main issue was whether the District could reasonably foresee "that a negligent driver might strike a pedestrian crossing the street" when the traffic light was not working. *Id.* at 1290. Unsurprisingly, the court held that it

could, even though the driver technically had "violated a criminal statute" by failing to yield the right of way. *Id.* But we took pains to add that the driver's negligence "was not an intentional act," *id.* at 1291, reflecting our awareness of how very different "the intervening act of another" was in *Carlson, id.* at 1290, from the unforeseeable criminal actions of third parties in *Potts, Bailey,* and *Clement.*

as a basis for common-law negligence. Its prior decisions, like this court's, were "cautious ... in extending liability to defendants for their failure to control the conduct of others," a "judicial resistance to the expansion of duty [growing] out of practical concerns both about potentially limitless liability and about the unfairness of imposing liability for the acts of another." *Id.* at 1061. Under the duty imposed by the District Court, by contrast, "[t]he pool of possible plaintiffs is very large—potentially, any of the thousands of victims of gun violence." *Id.* (footnote omitted). Moreover, the court reasoned,

> the connection between defendants, the criminal wrongdoers and plaintiffs is remote, running through several links in a chain consisting of at least the manufacturer, the federally licensed distributor or wholesaler, and the first retailer. The chain most often includes numerous subsequent legal purchasers or even a thief. Such broad liability, potentially encompassing all gunshot crime victims, should not be imposed without a more tangible showing that defendants were a direct link in the causal chain that resulted in plaintiffs' injuries, and that defendants were realistically in a position to prevent the wrongs.

*Id.* at 1061–62.

The court therefore rejected the plaintiffs' assertion of "a general duty of care aris[ing] out of the gun manufacturers' ability to reduce the risk of illegal gun trafficking through control of the marketing and distribution of their products," pointing out that to "impos[e] such a general duty of care would create not only an indeterminate class of plaintiffs but also an indeterminate class of defendants whose liability might have little relationship to

the [social] benefits of controlling illegal guns." *Id.* at 1063.[7] Although the plaintiffs had "presented [the court] with a novel theory—negligent marketing of a potentially lethal yet legal product, based upon the acts not of one manufacturer, but of an industry—we are unconvinced," the court concluded, that "on the record before us[ ] the duty plaintiffs wish to impose is either reasonable or circumscribed." *Id.* at 1068.

The plaintiffs here point out that *Hamilton* was not decided on a motion to dismiss but only after a trial had shown the absence of proof "that the gun used to harm [the injured plaintiff] came from a source amenable to the exercise of any duty of care that plaintiffs would impose upon defendant manufacturers." *Id.* at 1062. But the plaintiffs in our case do not claim that through discovery they may be able "tangibl[y]" to show "that defendants were a *direct* link in the causal chain that resulted in plaintiffs' injuries," *id.* (emphasis added)—that, in the language of our cases, those injuries were foreseeable to the defendants in the "heightened" sense entailing " 'precise proof' " of knowledge and corresponding ability to prevent required by our decisions. *Potts, supra.* At most the plaintiffs allege that the defendants in the aggregate know that a sizeable number of the firearms they manufacture make their way, through practices they reasonably could limit, into the District of Columbia and into the hands of criminals, sometimes with "only a short time passing between the retail sale of a firearm outside the District and its criminal misuse in the District." Complaint, ¶ 123. Even if, as they claim, discovery may enable them to tie a particular weapon used to kill or

---

7. Another way of viewing it, the court said, was that no evidence had been offered "tending to show to what degree [the plaintiffs'] risk of injury was enhanced by the presence of negligently marketed and distributed guns, as opposed to the risk presented by all guns in society." *Hamilton,* 727 N.Y.S.2d 7, 750 N.E.2d at 1062.

injure a named plaintiff or his decedent to a particular manufacturer, they would still not have established a cognizable—*i.e.*, a "reasonable or circumscribed," *Hamilton, supra*—duty to these plaintiffs rather than a duty to the class of all potential victims of gun violence in the District, or indeed anywhere else. They would not, in sum, have stated a claim under our decisions for common-law negligence based on injuries resulting from the criminal acts of third parties.

There is an additional important reason why we decline to recognize the plaintiffs' claim for common-law negligence in the distribution of firearms. The Council of the District of Columbia has intervened precisely in this area by enacting a strict liability statute governing the manufacture and sale of a class of abnormally dangerous firearms, *see* D.C.Code § 7–2551.02; under that statute—as we hold in part V, *infra*—the individual plaintiffs have stated a valid claim (and the District as well may have limited subrogation rights). In analogous circumstances, this court has refused to expand the boundaries of a common-law cause of action in tort. Specifically, in *Carl v. Children's Hosp.*, 702 A.2d 159 (D.C.1997) (en banc), the full court adopted the tort of wrongful discharge as an exception to the traditional at-will doctrine governing termination of employment, where the discharge violates "a clear mandate of public policy." *Id.* at 164. Although we left future applications of the tort to be decided on a case-by-case basis, we stressed that any such application must be "carefully tethered to fundamental policies" implicit in "statute[s] or municipal regulation[s], or

in the Constitution." *Id.* at 164. More important for present purposes, in succeeding cases we declined to apply this cause of action where the policy in question was not implicit—*i.e.*, embodied in some related statute—but rather was "explicit and [might] apply directly" through a statute expressly addressing the matter. *Freas v. Archer Servs., Inc.*, 716 A.2d 998, 1002 (D.C.1998) (rejecting application of *Carl* as unnecessary where suit was based on statutorily banned and actionable retaliation for exercising rights under the Workers' Compensation Act); *see also McManus v. MCI Communications Corp.*, 748 A.2d 949, 957 (D.C.2000) (noting and applying the court's previous rejection of "the argument ... that a public policy exception to the at-will doctrine applies to an alleged statutory violation"). The existence of § 7–2551.02 reinforces our unwillingness to relax basic "liability-limiting" standards, *Lacy, supra*, of duty, foreseeability, and causal remoteness to recognize the cause of action for common-law negligence that the plaintiffs advocate.[8]

## IV. Public Nuisance

Much of what we have said so far explains why we also reject on the pleadings the claim for public nuisance brought by the District of Columbia alone. The RESTATEMENT (SECOND) OF TORTS § 821B(1)(1979) defines that tort as "an unreasonable interference with a right common to the general public." The District argues that this cause of action "does not derive from its negligence claim but is an independent cause of action with distinct elements" (Reply Br. for District at

8. *See also Williams v. Baker,* 572 A.2d 1062, 1072 (D.C.1990) (en banc), where in adopting the zone of danger test limiting the class of persons who may claim negligent infliction of emotional distress, the court explained:

[T]his jurisdiction should not cast itself adrift on a sea of infinite foreseeability,

subject only to such arbitrary limitation as we should impose.... [T]he issue of whether a plaintiff can recover damages for fear of harm to a third person is a question of policy for the court, not one to be determined on a case-by-case determination of whether the injury was foreseeable.

7), namely, (1) an interference with a public right (2) that is unreasonable. Although this court referred to that definition of the tort in *B & W Mgmt., Inc. v. Tasea Inv. Co.*, 451 A.2d 879 (D.C.1982), the defendants and their amici argue that we have never recognized a public nuisance claim that did not involve either ownership (and control of) real property, criminal violations, or independently tortious conduct such as negligence—none of which are alleged, or sufficiently alleged, in this case.

As an independent tort, claims of nuisance have indeed not been treated favorably by this court's decisions. In recent cases we have even said that "nuisance is a type of damage and not a theory of recovery in and of itself," *Jonathan Woodner Co. v. Breeden*, 665 A.2d 929, 934 (D.C. 1995), so that recovery in such cases, "if at all, [must be] on the theory of negligence," *Bernstein v. Fernandez*, 649 A.2d 1064, 1072 (D.C.1991) (citation and quotation marks omitted), or another theory such as intentional infliction of emotional distress. *Jonathan Woodner Co., supra.* The District argues that these statements were made in the context of claims for private, not public, nuisance but our decision in *Bernstein* noted that, "for the purpose of our holding in this case," the point did not depend on "whether the alleged nuisance is public or private." *Bernstein,* 649 A.2d at 1073 n. 8. Even the RESTATEMENT definition explains "nuisance" by "reference to two particular kinds of harm—the invasion of two kinds of interests[, public and private]—by conduct that is tortious *only if it falls into the usual categories of tort liability.*" RESTATEMENT (SECOND) OF TORTS § 821A cmt. c (1979) (emphasis added).

█ The defendants here do not dispute, however, that a separate tort of public nuisance is cognizable in the District of Columbia, or that the RESTATEMENT provides the appropriate definition: "an unreasonable interference with a right common to the public." The question before us, instead, is whether the District has sufficiently pleaded that cause of action, and the answer to that question depends critically on how prepared we are to loosen the tort from the traditional moorings of duty, foreseeability, and causal remoteness that have made us reject the plaintiffs' claim of negligence. For the following reasons, we are not convinced that the public nuisance cause of action the District alleges is sufficiently distinguishable from its negligence claim to justify a different result.

The issue was defined pointedly by the majority and dissenting opinions in *People v. Sturm, Ruger & Co.*, 309 A.D.2d 91, 761 N.Y.S.2d 192 (2003), where the state's suit for public nuisance essentially mirrored the District's allegations in this case:

Plaintiff's complaint ... claims that illegally possessed handguns are a common-law public nuisance because they endanger the health and safety of a significant portion of the population; interfere with, offend, injure and otherwise cause damage to the public in the exercise of rights common to all; and that, after being placed on actual and constructive notice that guns defendants sell, distribute and market are being used in crimes, they have, by their conduct and omissions, created, maintained and contributed to this public nuisance, because they manufacture, distribute and market handguns allegedly in a manner that knowingly places a disproportionate number of handguns in the possession of people who use them unlawfully. Plaintiff further claims that defendants are on notice that certain types of guns, and guns sold in certain locales, are disproportionately used in the commission of crimes.

*Id.* at 194. The dissent in *Sturm, Ruger* took the position that "[a] negligence analysis, with its requirement of the existence of a duty limited by concomitant considerations of proximate cause, foreseeability, fault, intent, and tempered by notions of the equitable apportionment of economic liability, is inapposite to an action for abatement of a public nuisance brought by the state in the proper exercise of its police powers." *Id.* at 208 (Rosenberger, J., dissenting).

The majority rejected that proposition, in large part "based on the reasoning and implications of *Hamilton v. Beretta,* [*U.S.A., Corp., supra* ]." *Id.* at 194. It determined that "much of the Court[ of Appeals'] reasoning in dismissing the *Hamilton* negligent marketing complaint logically, and most aptly, applies to our consideration of this plaintiff's common-law public nuisance claim." *Id.* at 196. In particular, the *Hamilton* court's concern about "potentially limitless liability and about the unfairness of imposing liability for the acts of another" was "common to both negligent marketing and public nuisance claims," because to disregard "the existence, remoteness, nature and extent of any intervening causes between defendants' lawful commercial conduct and the alleged harm" would invite "a flood of limitless, similar theories of public nuisance, not only against these defendants, but also against a wide and varied array of other commercial and manufacturing enterprises and activities." *Id.* at 196–97. Whereas New York decisions validating public nuisance claims had "involve[d] specific harm directly attributable to defendant or defendant's activity," *id.* at 198 n. 2, the present complaint would "impose[ ] an undefined duty of care on handgun manufacturers and distributors," *id.* at 200, despite the "intervention of unlawful and frequently violent acts of criminals—over whom defendants have absolutely no control—who actually, directly, and most often intention-

ally, cause the cited harm." *Id.* at 199. The court concluded that the legislative and executive branches were "vastly better suited to address" the "societal problems associated with, or following, legal handgun manufacturing and marketing," "problems which may be as remote from a defendant's conduct and control as these." *Id.* at 203.

We agree with this reasoning, and are similarly unwilling to recognize a claim of common-law public nuisance that disregards, or greatly dilutes, the liability-limiting factors applied in part III, *supra.* The sheer number of causal links, and resulting attenuation, that underlie the District's claim of injury from the defendants' invasion of a public right were described by the Supreme Court of Connecticut in a similar suit brought by the city of Bridgeport:

> The manufacturers sell the handguns to distributors or wholesalers and ... those sales are lawful because federal law requires that they be by licensed sellers to licensed buyers. The distributors then sell the handguns to the retailers, sales that, again, are required by federal law to be by licensed sellers to licensed buyers. The next set of links is that the retailer then sells the guns either to authorized buyers, namely, legitimate consumers, or, through the "straw man" method or other illegitimate means, to unauthorized buyers, sales that likely would be criminal under federal law. Next, the illegally acquired guns enter an "illegal market." From that market, those guns end up in the hands of unauthorized users. Next, either the authorized buyers misuse the guns by not taking proper storage precautions or other unwarned or uninstructed precautions, or the unauthorized buyers misuse the guns to commit crimes or other harmful acts. Depending on the nature of the conduct of the

users of the guns, the plaintiffs then incur expenses for such municipal necessities as investigation of crime, emergency and medical services for the injured, or similar expenses. Finally, as a result of this chain of events, the plaintiffs ultimately suffer ... increased costs for various municipal services, ... injuries and deaths of Bridgeport's residents, ... and a negative impact on the ... ability of the residents to live free from apprehension of danger.

*Ganim v. Smith & Wesson Corp.*, 258 Conn. 313, 780 A.2d 98, 123–24 (2001).[9] The court rejected a claim of public nuisance brought by "a plaintiff situated as remotely from the defendants' conduct as these plaintiffs are, or who present[ ] a chain of causation as lengthy and multifaceted as these plaintiffs have." *Id.* at 133.

Other courts likewise have rejected public nuisance as a basis for holding gun manufacturers and distributors liable, for reasons of attenuation, remoteness, or inability to control the nuisance. *See generally Tioga Pub. School Dist. # 15 v. United States Gypsum Co.*, 984 F.2d 915, 920 (8th Cir.1993) ("[L]iability for damage caused by a nuisance turns on whether the defendant is in control of the instrumentality alleged to constitute a nuisance, since without control a defendant cannot abate the nuisance."). The court in *Camden County Bd. of Chosen Freeholders v. Beretta, U.S.A., Corp.*, 273 F.3d 536 (3d Cir.2001), for example, recited "a chain of seven links" necessary to "connect the manufacture of handguns with municipal crime-fighting costs," and held that

[t]his causal chain is simply too attenuated to attribute sufficient control to the manufacturers to make out a public nuisance claim. In the initial steps, the manufacturers produce lawful handguns and make lawful sales to federally licensed gun distributors, who in turn lawfully sell those handguns to federally licensed dealers. Further down the chain, independent third parties, over whom the manufacturers have no control, divert handguns to unauthorized owners and criminal use.

*Id.* at 541. The same court in *City of Philadelphia v. Beretta, U.S.A., Corp.*, 277 F.3d 415 (3d Cir.2002), rejected the city's attempt "to shorten the causal chain by arguing that the 'thriving illegal market ... injures [it], even before any guns acquired in the illegal market are actually used in the commission of a crime.'" *Id.* at 424. This assertion, the court explained, "does not reduce the links that separate a manufacturer's sale of a gun to a licensee and the gun's arrival in the illegal market through a distribution scheme that is ... lawful" and a succession of unlawful third-party acts (such as straw purchases) "likely [to be] ... long[ ] and ... varied." *Id.* (footnote omitted). *See also Ileto v. Glock, Inc.*, 194 F.Supp.2d 1040, 1061 (C.D.Cal.2002) ("Plaintiffs have failed to allege facts that would support a finding that [defendant] had control over the nuisance at the time Plaintiffs were injured.").

The District argues that analogizing to negligence principles of foreseeability, intervening causation, remoteness and the

---

**9.** Like the Connecticut complaint, the District's public nuisance claim alleges that the "[d]efendants' ongoing conduct has created an ongoing public nuisance of readily available handguns and machines guns ... that unreasonably interferes with District residents' enjoyment of health, safety, and peace .... As a result of the continued possession and use of these firearms, residents of the District will be killed and injured, and the public will continue to fear for its health, safety, and welfare and will be subjected to conduct that creates a reasonable apprehension of danger to person and property." Complaint, ¶ 164.

like is improper here because the complaint alleges *intentional* tortious conduct by the manufacturers and distributors. *See* Reply Br. for District at 7 (quoting RESTATEMENT § 821B cmt. e) (emphasis added) ("[T]he defendant is held liable for a public nuisance if his interference with the public right was ·*intentional* or was unintentional and otherwise actionable under the principles controlling liability for negligent or reckless conduct"). But in order to plead intentional wrongdoing sufficient to support a nuisance claim, the District had to plead facts supporting the conclusion that each defendant either intended the consequences of its commercial acts or was substantially certain that those consequences would occur. *See Wager v. Pro,* 195 U.S.App. D.C. 423, 428–29, 603 F.2d 1005, 1010–11 (1979); *see also Kawaauhau v. Geiger,* 523 U.S. 57, 61–62, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998) ("Intentional torts generally require that the actor intend 'the consequences of an act,' not simply 'the act itself.'") (citing RESTATEMENT (SECOND) OF TORTS § 8A cmt. a (1964)). Although the consequence the complaint defines as a public nuisance is "the ready *availability* of handguns, 'machine guns,' and other unlawfully possessed firearms," Complaint, ¶ 162 (emphasis added), "the gravamen of the complaint is that guns are used in crime, with resulting deaths and injuries to [District] residents, prompting much of the expenses [the District] claims as damages." *City of Philadelphia,* 277 F.3d at 424 n. 13; *see, e.g.,* Complaint, ¶ 4 ("Plaintiffs have suffered and continue to suffer harm ... [as a result of] shootings and criminal conduct in the District that have been, and continue to be, caused by the Defendants' conduct"). Nothing in the complaint suggests that any of these manufacturers intended or knew with substantial certainty that any specific shooting-related injuries or deaths would occur within the District (or elsewhere) as a result of their sale of particular firearms to distributors and dealers outside the District. Rather, what the complaint alleges is that the defendants in the *aggregate* know that some *indeterminate* number of the firearms they produce will make their way into the hands of criminal users in the District of Columbia. To accept such general and remote knowledge of consequences as sufficient to plead public nuisance would erase any similarity between that right of action and "the usual categories of tort liability," RESTATEMENT (SECOND) OF TORTS § 821A cmt. c (1979), something our decisions do not permit. *See, e.g., Jonathan Woodner Co., supra; Bernstein, supra; District of Columbia v. Fowler,* 497 A.2d 456, 461 n. 8 (D.C.1985) ("No matter what the precise underlying legal theory may be, ... some 'tortious conduct' such as negligence is a necessary component of virtually all nuisance claims.").

In the end, the District's nuisance theory amounts to a claim that the licensed manufacture and sale of firearms *by itself,* because of the foreseeable effects it produces, constitutes a public nuisance. As will be seen, that is an apt summary description of the legislative findings the Council of the District of Columbia made in adopting a strict liability statute for the manufacture and distribution of a class of abnormally dangerous firearms. But as a theory of common-law liability, it is only nominally distinguishable from the endeavor in *Delahanty, supra,* to extend the RESTATEMENT doctrine of "abnormally dangerous activity" to the manufacture and sale of particular handguns, a claim we rejected because of the remoteness of the link between the activity—"not dangerous in and of itself"—and the harm that results from the ·criminal misuse of guns. *Delahanty,* 564 A.2d at 761 (citation and internal quotation marks omitted). Moreover, what we stated at the end of our discussion

of negligence, part III, *supra,* applies with equal importance here: The legislature by enacting D.C.Code § 7–2551.02 has relaxed the liability-limiting elements of traditional tort law in creating a cause of action against gun manufacturers and distributors for injuries caused by particular firearms. For these reasons, we are not persuaded of either the necessity or the wisdom of adopting judicially a right of action for public nuisance applied to the manufacture and sale of guns, where the effect would be to supplant common-law limitations of duty, foreseeability, and direct causation with the latitudinarian standards of "an unreasonable interference with a [public] right," *see generally N.A.A.C.P. v. AcuSport, Inc.,* 271 F.Supp.2d 435 (E.D.N.Y.2003) [10]—a tort that, as pleaded here, could generate suits "not merely against these defendants[ ] but ... against ... other types of commercial enterprises, in order to address a myriad of societal problems ... regardless of the distance between the 'causes' of the 'problems' and their alleged consequences." *Sturm, Ruger,* 761 N.Y.S.2d at 203.

## V. Strict Liability

In Count I, the plaintiffs all have brought suit under D.C.Code § 7–2551.01 *et seq.* (2001), the Assault Weapon Manufacturing Strict Liability Act of 1990 (the "SLA" or "Act"). The operative provision of the statute, § 7–2551.02, states:

> Any manufacturer, importer, or dealer of an assault weapon or machine gun shall be held strictly liable in tort, without regard to fault or proof of defect, for all direct and consequential damages that arise from bodily injury or death if

the bodily injury or death proximately results from the discharge of the assault weapon or machine gun in the District of Columbia.

The SLA defines "assault weapon" to include a number of specific products, and invests "machine gun" with the same meaning defined in D.C.Code § 7–2501.01(10), *i.e.,* "any firearm which shoots, is designed to shoot, or can be readily converted or restored to shoot: (A) Automatically, more than 1 shot by a single function of the trigger; [or] (B) Semiautomatically, more than 12 shots without manual reloading." In enacting the SLA, the D.C. Council understood assault weapons to "include both automatic and semiautomatic weapons," as well as "some handguns and rifles," a class of weapons that it found have pernicious consequences for the health and safety of District residents and visitors to the District. SLA § 2(2), D.C. Law 8–263 [Act 8–289], § 2, 37 DCR 8482 (Dec. 28, 1990) (hereafter "Findings").

The trial court dismissed this count as to all defendants, concluding that (1) the statute provides no cause of action to the District of Columbia and (2), in any case, (a) the plaintiffs failed to state a claim within the Act and (b) the SLA is an unconstitutional attempt at extraterritorial regulation, violating both the Commerce Clause and principles of due process. We therefore confront three issues:

> A. Does the SLA, or any other statute by implication, give the District of Columbia a right of recovery for liability under the SLA;

---

10. *See, e.g., N.A.A.C.P.,* 271 F.Supp.2d at 496 ("The rule employed with respect to limitations on liability, whatever label is used, in public nuisance actions must be less restrictive than in individual tort actions"); *id.* at 493 ("intervening actions, even multiple or criminal intervening actions, need not break the chain of causation"); *id.* ("[w]here multiple actors contribute to a public nuisance, equity can reach actors whose conduct standing alone might not be actionable.").

B. Did the complaint sufficiently plead the defendants' liability to the plaintiffs under the SLA; and, if so,

C. Does the SLA impermissibly burden interstate commerce or violate due process?

We answer these questions in order.

### A. District of Columbia

 "The text of an enactment is the primary source for determining its drafters' intent." *Stevenson v. District of Columbia Bd. of Elections & Ethics,* 683 A.2d 1371, 1376 (D.C.1996) (citation and quotation marks omitted). "In the ordinary case, absent any indication that doing so would frustrate [the legislature's] clear intention or yield patent absurdity, our obligation is to apply the statute as [the legislature] wrote it." *Hubbard v. United States,* 514 U.S. 695, 703, 115 S.Ct. 1754, 131 L.Ed.2d 779 (1995) (citation and internal quotation marks omitted); *see also Peoples Drug Stores, Inc. v. District of Columbia,* 470 A.2d 751, 753–54 (D.C. 1983). At the same time, we do not read statutory words in isolation; the language of surrounding and related paragraphs may be instrumental to understanding them. *See Carey v. Crane Serv. Co.,* 457 A.2d 1102, 1108 (D.C.1983). "Statutory construction is a holistic endeavor, and, at a minimum, must account for a statute's full text, language . . . , structure, and subject matter." *United States Nat'l Bank of Oregon v. Independent Ins. Agents of Am.,* 508 U.S. 439, 455, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993) (citation and internal quotations marks omitted).

 Applying these standards, we hold that the SLA confers a right of action on individuals who are injured, but not the District of Columbia. The statute makes manufacturers and others strictly liable in tort "for all direct and consequential damages that arise from · *bodily injury or death* if the bodily injury or death proximately results from the discharge of" one of the enumerated firearms. Section 7–2551.02 (emphasis added). Bodily injury or death self-evidently can happen only to individual persons, not corporate entities. Surrounding provisions of the statute confirm the purpose to give redress to individuals. The statute does "not operate to limit in scope any cause of action, other than that provided by this [subchapter], available to a *person* injured by an assault weapon." Section 7–2551.03(c) (emphasis added). And, it affords no right of action to "a *person* injured by an assault weapon while committing a crime," or to one seeking recovery "for a *self*-inflicted injury" resulting from "a reckless, wanton, or willful discharge of an assault weapon." Section 7–2551.03(b) & (e) (emphases added). The subject of these provisions, then, is a right of action—granted, preserved, or withheld—of individuals, not government, to sue for damages arising from bodily injury or death traceable to assault weapons.[11]

The District distinguishes between the verb the legislature used—"arise from"—and others it might have used if it meant to restrict the class of those entitled to recover damages to individuals. "Individuals' injuries," the District reasons, "are the source of the District's damages under the SLA, including the costs of law enforcement and healthcare services that

---

11. The legislative findings accompanying the Act reinforce this point, stating (among other things) that the manufacture and distribution of assault weapons "expos[es] the citizens [of] and visitors to the District [of Columbia] to a high degree of risk of serious harm," and "[a]s between the manufacturer or dealer of an assault weapon on the one hand and *the innocent victim* of the discharge of an assault weapon on the other hand, the manufacturer or dealer is more at fault than the victim." Findings (14) & (15), 37 DCR at 8483 (emphasis added).

'arise from' the 'bodily injury or death' of individuals." Br. for District at 38; *see also* Reply Br. for District at 23 (claiming a right under the SLA "to recover the expenses that it [has] incurred for law enforcement, health-care services, paid leave of employees, and other services" attributed to gun violence). But one need only consider the magnitude—the unboundedness—of such "damages" to realize the implausibility of the argument that the Council provided for them in the SLA by its choice of a verb and nothing else. "Arise from" may well connote a causal relation less direct and immediate than, say, "result from," but to freight it with a legislative intent to include the vast array of law enforcement costs and governmental health-care services attributable to assault weapon injuries as recoverable under the statute demands far more than the verb alone can bear. Neither it nor the addition of "consequential" to the "direct" damages recoverable expands, in our judgment, the class of those given a cause of action by the SLA.

The District asserts, however, an additional and more limited claim for damages that we conclude has partial—but only partial—validity. The complaint alleges that in addition to the right of action the SLA gives the District (a claim we have rejected), the District may recover under two other statutes the medical and related expenses it has incurred as a result of third-party wrongful conduct. Specifically, D.C.Code § 4–601 *et seq.* (2001), the Health–Care Assistance Reimbursement Act of 1984 (HCARA), grants the District "an independent, direct cause of action against [a] third party for the unreimbursed value or cost of … health-care assistance," whenever the District has "provide[d] health-care assistance to a beneficiary who has suffered an injury or illness under circumstances creating liability in [that] third party." *Id.* § 4–602(a). "Beneficiary" means "any individual who

has received health-care assistance from the District and, if applicable, that individual's guardian, conservator, personal representative, estate, dependants, and survivors." *Id.* § 4–601(1). Another statute, D.C.Code § 5–601 *et seq.* (2001), the Medical Care Recovery Act of 1978 (MCRA), similarly gives the District a "right to recover" health-care and funeral expenses it has paid for police officers and firefighters, and the costs of their extended absence with pay, from third-parties whose tortious conduct resulted in injuries to those employees. *Id.* § 5–602.

Both statutes effectively give the District rights of "legal subrogation," D.C.Code § 4–602(b), to any right or claim a beneficiary or specified District employee has against a third-party tortfeasor. Relying on these provisions, the complaint alleges that as a proximate result of the defendants' conduct, the District "has incurred and will incur costs that are recoverable under [the HCARA and the MCRA] including: (1) health care costs and Medicaid expenses in treating victims of gun violence …; (2) costs of care and treatment provided to officers and members of the Metropolitan Police Department and the Fire Department of the District of Columbia …; and (3) leave of absence wages and other assistance and compensation paid or to be paid police officers and firefighters … on account of their having suffered gun injuries." Complaint, ¶ 137. Framed this broadly, these allegations do not add anything to the District's claim of a right to recover under the SLA, which we have rejected. Both the HCARA and the MCRA allow the District to recover specific unreimbursed costs for care and assistance to *individual* victims of tortious third-party conduct. Neither statute provides for recovery of undifferentiated—indeed, unlimited—costs "the District has incurred and will incur" for the care and treatment of an indeterminate class of "victims of gun violence," including civil-

ians, police, and firefighters not otherwise identified by the complaint. It is doubtless true that the District "is incurring, and will continue to incur great expense for the services of hospitals, physicians, nurses," etc. to "care [for] and treat [assault weapon] victims' injuries," Complaint, ¶ 135, but neither the HCARA nor the MCRA gives the District a right to aggregate these expenses in a single action combining innumerable claims for subrogation, each involving factually and legally distinct issues and all subject to different defenses—in short, a "kind of subrogation-in-gross." *Massachusetts Laborers' Health & Welfare Fund v. Philip Morris, Inc.,* 62 F.Supp.2d 236, 246 (D.Mass.1999).

 On a far more specific level, however, the District has stated a claim under the HCARA that should not have been dismissed, provided that—as we hold in part V. B., *infra*—the individual plaintiffs have stated a claim under the SLA. As to one plaintiff, Bryant Lawson, the complaint alleges that as a result of injuries he suffered from bullets "most likely ... fired by a 'machine gun' ... manufactured, imported, or sold by one of the [d]efendants," Complaint, ¶ 56, he "relied on Medicaid to pay for the surgery, hospitalization, medications, and rehabilitation he needed because of his gunshot wounds" and he "continues to rely on Medicaid to treat the frequent problems that result from his being a quadriplegic." Complaint, ¶ 58. Regarding a second plaintiff, Gregory Ferguson, the complaint alleges that as a proximate cause of having been struck by bullets from an AK–47–type weapon, he "spent several days in D.C. General Hospital and over a year in physical therapy." As these allegations exemplify, to the extent the complaint cites specific nonreimbursed medical expenses incurred by the District for the treatment

of individual named plaintiffs, the HCARA authorized the District to "[i]ntervene ... in [this] proceeding brought by the beneficiary," D.C.Code § 4–604(a)(2), to attempt to recover those expenses. The District should be treated as having done so, and may remain in the case for that purpose.

## B. Rule 12(b)(6)

 By its terms, § 7–2551.02 requires proof tying an assault weapon or machine gun that causes death or bodily injury to a particular manufacturer, importer, or dealer ("Any manufacturer, [etc.] of *an* assault weapon ... shall be held strictly liable ... if the bodily injury ... proximately results from the discharge of *the* assault weapon" (emphasis added)). The trial court dismissed the individual plaintiffs' claims under the statute because none of the plaintiffs could identify in the complaint "which defendant and corresponding [machine gun or assault weapon] was involved in their respective injury or death of the relevant decedent." The court acknowledged that "[t]he involvement of a recovered weapon might potentially moot many of the legal deficiencies associated with the plaintiffs' reliance on the [SLA]," but concluded that since "*none* of the individual plaintiffs bases his or her case on weapons that were actually recovered, their claims are pled on pure speculation" (emphasis in original). In our view, requiring the plaintiffs to identify with particularity the weapons that caused their injuries and the manufacturers of those weapons at this early stage of the proceedings is contrary to the usual rules of pleading, and does not justify dismissal under Rule 12(b)(6).

In substance, each individual plaintiff alleged that the injuries of which he or she complains were caused by an assault weapon or a machine gun as defined by the SLA.[12] "Under conventional liberal rules of

12. For example, the complaint alleged that Andre Wallace, the son of plaintiff Laura Wal-

lace, and Natasha Marsh, the daughter of

'notice' pleading," *West v. Morris,* 711 A.2d 1269, 1271 (D.C.1998); *see* Super. Ct. Civ. R. 8(a), those allegations were sufficient to state a claim because dismissal under Rule 12 is proper only if it is apparent "beyond doubt the plaintiff[s] can prove no set of facts in support of [their] claim[s] which would entitle [them] to relief." *Owens v. Tiber Island Condo. Ass'n,* 373 A.2d 890, 893 (D.C.1977); *see Vincent v. Anderson,* 621 A.2d 367, 372 (D.C.1993) (issue of "whether or not appellant[s] had available evidence sufficient to prove the allegations in [their] complaint," "really had nothing to do with the legal sufficiency of the complaint"). The trial court found "no excuse for [each plaintiff's] inability to assert which defendant's weapon was used to harm him, if this fact is knowable at all," but that criticism is premature, as is the court's comment that the defendant manufacturers and distributors "surely have no access to the weapons that were physically associated" with the individual plaintiffs' claims. The plaintiffs point to several avenues for linking a firearm to a particular manufacturer that may be open to them in discovery, and even if all seem "speculative" to us as a way of arriving at that link, none may be rejected at this stage. *See, by contrast, Bly v. Tri–Cont'l Indus., Inc.,* 663 A.2d 1232, 1236 (D.C.1995) (summary judgment properly granted manufacturers *after discovery* for "lack of evidence as to which of [defendant's] products" caused plaintiffs' injuries).

### C. Constitutional Challenges

The defendants argue that the SLA violates both the Commerce Clause and due process principles applicable to the Dis-

trict through the Fifth Amendment. In essence the argument is that, "[b]y imposing strict liability on firearms manufacturers for conduct which is wholly lawful where it takes place—that is, the lawful manufacture, production and distribution of firearms outside of the jurisdiction of the statute—the [SLA] ... impermissibly burden[s] the lawful interstate commerce of firearms" and "arbitrarily attempt[s] to impose [a] regulatory scheme ... beyond the boundaries of the state which enacts [it]." Br. for Appellees at 69, 73. We consider first the Commerce Clause argument, then the claim of violation of due process. Neither argument persuades us.

#### 1. Commerce Clause

■■■■ "Though phrased as a grant of regulatory power to Congress, the [Commerce] Clause has long been understood to have a 'negative' [or dormant] aspect that denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." *Oregon Waste Sys. v. Department of Envtl. Quality,* 511 U.S. 93, 98, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994); *see District of Columbia v. Eastern Trans–Waste of Md., Inc.,* 758 A.2d 1, 16 (D.C.2000). Of course, "[l]egislation, in a great variety of ways, may affect commerce and persons engaged in it without constituting a regulation of it, within the meaning of the Constitution." *Head v. New Mexico Bd. of Exam'rs in Optometry,* 374 U.S. 424, 428, 83 S.Ct. 1759, 10 L.Ed.2d 983 (1963) (citations and internal quotation marks omitted). In particular, "the Constitution when conferring upon Congress the regu-

---

plaintiff Madilia Marsh–Williams, were shot and killed by three men, at least one of whom was armed with a 9mm pistol. Complaint, ¶ 82. Nine-millimeter bullets were recovered from the bodies of both victims. Complaint, ¶ 87. "On information and belief, the bullets that killed Wallace and Marsh were fired by a

'machine gun' or 'assault weapon' as those terms are defined by the Strict Liability Act." *Id.* Only the plaintiff Lawson qualified his allegation by stating that he was "most likely" shot by a weapon covered by the Act, but that does not affect the sufficiency of the allegation.

lation of commerce, . . . never intended to cut the States off from legislating on all subjects relating to the health, life, and safety of their citizens, though the legislation might indirectly affect the commerce of the country." *Id.* (internal quotation marks omitted). Under the "two-tiered approach" adopted by the Supreme Court,

> [w]hen a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor instate economic interests over out-of-state interests, we have generally struck down the statute without further inquiry. When, however, a statute has only indirect effects on interstate commerce and regulates evenhandedly, we have examined whether the [s]tate's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits.

*Brown–Forman Distillers Corp. v. New York State Liquor Auth.,* 476 U.S. 573, 579, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986) (citations omitted).

The vice against which the first, or anti-discrimination, component of this test operates is "local economic protectionism, laws that would excite those jealousies and retaliatory measures the Constitution was designed to prevent." *C & A Carbone, Inc. v. Town of Clarkstown, New York,* 511 U.S. 383, 390, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994). No serious argument is made that the SLA exhibits economic protectionism. Because there *are* no legal manufacturers, distributors, or sellers of assault weapons and machine guns in the District of Columbia,[13] the SLA does not discriminate in favor of in-state business or economic interests against their out-of-state counterparts. *See Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 125, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978) ("[S]ince there are no local producers or refiners,

such claims of disparate treatment between interstate and local commerce would be meritless."). And, contrary to what the defendants do argue, the SLA does not "directly regulate[ ] . . . interstate commerce." *Brown–Forman Distillers Corp.,* 476 U.S. at 579, 106 S.Ct. 2080. It does not regulate in any direct sense, but instead simply imposes liability for harm caused by an especially dangerous subset of firearms; and it limits that right of action to injuries incurred in the District of Columbia. It may have *effects* outside of the District if manufacturers alter their business practices to avoid that liability, but "[l]egislation . . . may affect commerce and persons engaged in it without constituting a regulation of it, within the meaning of the Constitution." *Head,* 374 U.S. at 428, 83 S.Ct. 1759 (citation and internal quotation marks omitted). *See Sherlock v. Alling,* 93 U.S. 99, 103, 23 L.Ed. 819 (1876) (state statute "declar[ing] a general principle respecting the liability of all persons within the jurisdiction of the State for torts resultin[g] in the death of parties injured" does not offend the dormant Commerce Clause); *Stone v. Frontier Airlines, Inc.,* 256 F.Supp.2d 28, 46 (D.Mass.2002) (rejecting argument that "the dormant Commerce Clause precludes state tort law from regulating any activity that, while having local effects, also effectuates some external consequences").

■■■ The validity of the SLA against Commerce Clause challenge thus depends on whether it "imposes a burden on interstate commerce that is 'clearly excessive in relation to the putative local benefits.'" *C & A Carbone, Inc.,* 511 U.S. at 390, 114 S.Ct. 1677 (quoting *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970)). State regulation on subjects "relating to the health, life, and

---

13. The manufacture and distribution of machine guns is prohibited in the District,

D.C.Code § 7–2504.01 (2001), as is their possession. *Id.* §§ 7–2502.01 & –2502.02(a)(2).

safety of ... citizens," *Head,* 374 U.S. at 428, 83 S.Ct. 1759, receives special deference in that analysis. *See Smith v. District of Columbia,* 436 A.2d 53, 58 (D.C. 1981); *Electrolert Corp. v. Barry,* 237 U.S.App. D.C. 328, 331, 737 F.2d 110, 113 (1984). The "benefits" of the SLA to the District of Columbia are reflected in the legislative findings that accompanied its passage. The D.C. Council found (a) that "the increase in homicides in the District has been accompanied by a proliferation of use of assault weapons (*i.e.,* automatic and semi-automatic guns) in the community," with "[s]emi-automatic handguns represent[ing] a growing percentage of the handguns recovered by the [police and] ... involved in handgun crime"; (b) that "[a]ssault weapons, and the manufacture and distribution of assault weapons are abnormally and unreasonably dangerous, and pose risks to the citizens of and visitors to the District which far outweigh any benefits that assault weapons may bring"; (c) that "[i]t is foreseeable by manufacturers and distributors of assault weapons that the criminal or accidental use of assault weapons will cause injury and death"; and (d) that the manufacture and distribution of these weapons "are among the proximate causes of the rising number of homicides in the District, exposing the citizens [of] and visitors to the District to a high degree of risk of serious harm." Findings (9), (10), (12), (13), & (14), 37 DCR 8483. The legislation, in short, addresses a pressing concern for public safety by giving innocent victims of gun violence in the District a cause of action against manufacturers or dealers for injuries caused by particularly lethal firearms whose destructiveness outweighs any legitimate utility they may have.

In contrast to this strong governmental interest, any effect the SLA would have on interstate commerce is "incidental ... [and not] clearly excessive in relation to the ... local benefits." *Pike,* 397 U.S. at 142, 90 S.Ct. 844. Only firearms the Council has classified as "abnormally and unreasonably dangerous" are covered by the Act, and liability attaches only for death or injuries resulting from the discharge of one of these weapons in the District of Columbia—and then only when the link has been established between a specific manufacturer and the gun that caused the injury. Moreover, assault weapons "originally distributed to a law enforcement agency or ... officer" are excluded from the statute's reach, § 7–2551.03(a), as are firearms used by persons injured while committing crimes or who injured themselves. Section 7–2551.03(b), (e). Given these limitations, the defendants are hard put to explain how the SLA burdens interstate commerce any more than does the District's longstanding comprehensive statutory ban on the possession, sale, or transfer of virtually all firearms, which we upheld against Commerce Clause attack in *McIntosh v. Washington,* 395 A.2d 744, 756–57 (D.C.1978). *See also Smith,* 436 A.2d at 59–60 ("The District ... also bars unlicensed pistols, ... machine guns, [and] sawed-off shotguns"; "[i]t is well within the police power of the District ... to declare as contraband such inherently dangerous articles without offending the commerce clause").

Indeed, it is not apparent why the SLA's effect on interstate commerce is greater than that of numerous other state laws imposing liability in tort on manufacturers of defective or abnormally dangerous products. *See, e.g., Tigue v. E.R. Squibb & Sons, Inc.,* 136 Misc.2d 467, 518 N.Y.S.2d 891, 897 (N.Y.Sup.Ct.1987), *aff'd,* 139 A.D.2d 431, 526 N.Y.S.2d 825 (1988), *aff'd sub nom. Hymowitz v. Eli Lilly & Co.,* 73 N.Y.2d 487, 541 N.Y.S.2d 941, 539 N.E.2d 1069 (1989) (holding that relaxation of the traditional product identification requirement in tort law to provide a forum to

innocent victims of the drug DES was not a "clearly excessive" burden "in relation to the putative local benefits" and, hence, was not violative of the Commerce Clause). The defendants profess alarm that the SLA, if upheld, will "require [them] to alter their legal business practices on a national and international level." Br. for Appellees at 71. But given the limitations on the reach of the Act we·have described, that fear seems fanciful, especially since it stems mainly from concern with the broader remedies the plaintiffs have sought— *i.e.,* injunctive and "abatement" relief—for the alleged negligence and public nuisance,[14] claims we have rejected here. In any event, the fact that exposure to "product liability in tort, whether strict or otherwise," may also

> affect commercial decisions by actors in other states, such as ... manufacturers, does not implicate the Commerce Clause. Differences in the conditions and risks of doing business from state to state are in part the inevitable result of *any* state economic regulation, but the effects that these differences have on commercial decisions, even those that involve interstate trade, are not by themselves nearly so direct as to 'affect commerce' in the constitutional sense.

*Bowman v. Niagara Mach. & Tool Works, Inc.,* 832 F.2d 1052, 1056 (7th Cir.1987) (emphasis in original).

### 2. Due Process

■ "A person who sets in motion in one State the means by which injury is inflicted in another may, consistently with the due process clause, be made liable for that injury whether the means employed be a responsible agent or an irresponsible instrument." *Young v. Masci,* 289 U.S. 253, 258, 53 S.Ct. 599, 77 L.Ed. 1158

(1933). As we have seen, the SLA imposes liability on out-of-state manufacturers of firearms (there are none in the District) for injuries caused to innocent persons from the "discharge of [an] assault weapon or machine gun *in the District of Columbia.*" D.C.Code § 7–2551.02 (2001) (emphasis added). The defendants nevertheless argue that the SLA constitutes an attempt by the District to impose its own policy choices as to gun regulation on other states where the manufacture of machine guns is lawful, thereby violating due process. They rely principally on *BMW of N. Am., Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996)—or more precisely on two sentences from *Gore.* The first is the Court's statement that "it follows from ... principles of state sovereignty and comity that a State may not impose economic sanctions on violators of its laws with the intent of changing the tortfeasors' lawful conduct in other States." *Id.* at 572, 116 S.Ct. 1589. The second, providing the due process link, is that " '[t]o punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort.' " *Id.* at 573 n. 19, 116 S.Ct. 1589 (citation omitted).

■ The defendants first of all confuse punishment—and the issue of punitive damages before the Court in *Gore*—with a state's authority to permit compensation to victims for injuries suffered within its jurisdiction. In *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003), which also dealt with punitive damages and applied *Gore,* the Court made that distinction explicit. *See id.* at 416, 123 S.Ct. 1513 (explaining the "different purposes" served by compensatory and punitive damages).

**14.** See Br. for Appellees at 71 ("By the injunctive relief or 'abatement' they request, plaintiffs ultimately seek broad reforms in defendants' national and international business practices according to plaintiffs' own policy preferences.").

One looks in vain in either *Gore* or *State Farm* for a suggestion that a state may not permissibly decide that certain products, whether manufactured within or outside a state, are so dangerous that their manufacturers should face strict liability in tort for injuries the products contribute to within the State. *Gore*, in fact, affirmed a state's right to impose "economic penalties" on out-of-state manufacturers, "whether the penalties take the form of legislatively authorized fines or judicially imposed punitive damages," so long as such penalties are "supported by the State's interest in protecting its own consumers." *Gore*, 517 U.S. at 572, 116 S.Ct. 1589.[15] Under *Gore*, the SLA would violate due process only if it penalized manufacturers "for conduct that was lawful where it occurred *and that had no impact on [the District ] or its residents*." *Id.* at 573, 116 S.Ct. 1589 (emphasis added); *see also State Farm*, 538 U.S. at 422, 123 S.Ct. 1513 (for punitive damage purposes, "[l]awful out-of-state conduct may be probative" if it has "a nexus to the specific harm suffered by the plaintiff"). In sum, no due process issue is raised by legislation that seeks to redress injuries suffered by District residents and visitors resulting from the manufacture and distribution of a particular class of firearms whose danger far outweighs their utility. *See, e.g., City of Boston v. Smith & Wesson Corp.*, 66 F.Supp.2d 246, 250 (D.Mass.1999) ("As plaintiffs here are seeking relief only on behalf of injured parties in Massachusetts, the holding of the *Gore* case does not apply.").

## VI. Conclusion

For the foregoing reasons, the judgment of the Superior Court is affirmed in part and reversed in part, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

---

**15.** The SLA does not provide for any award of punitive damages; by its terms it permits recovery only for "all direct and consequential damages." D.C.Code § 7–2551.02.